PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4616
_____

UNITED STATES OF AMERICA

v.

JEROME HINES,

Appellant


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-08-cr-0133-001)

District Judge: Honorable Dennis M. Cavanaugh


Argued
October 7, 2010

Before: FUENTES, JORDAN and ALDISERT, Circuit
Judges

(Opinion Filed: December 14, 2010)

Richard Coughlin
Federal Public Defender
District of New Jersey

Louise Arkel (ARGUED)
Lisa M. Mack
1002 Broad Street, Fourth Floor
Newark, New Jersey 07102
        *Attorneys for Appellant*

Paul J. Fishman
United States Attorney
District of New Jersey

George S. Leone
Steven G. Sanders (ARGUED)
Assistant United States Attorneys
970 Broad Street
Newark, New Jersey 07102-2535
        *Attorneys for Appellee*

OPINION OF THE COURT

ALDISERT, <u>Circuit Judge</u>.

Jerome Hines appeals from a jury conviction for the offense of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), as well as from the sentence imposed by the District Court for the District of New Jersey. He presents two issues for our consideration. First, he challenges as an abuse of discretion the District Court's denial of his pretrial request for an evidentiary

2

hearing to determine the events leading up to his arrest. Second, he contends that the District Court misapplied the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") when it counted in his criminal history score four prior convictions under New Jersey Statute § 2C:33-2.1(b). Because Hines did not make the case for an evidentiary hearing, and because the District Court correctly applied the Guidelines, we will affirm its rulings in both respects.

I.

In October of 2007, Police Officers Angel Romero and Jay Small were patrolling Newark, New Jersey, in a police car. According to Romero's later police report, the two were near the corner of Orange and Nesbitt Streets when one or both of the officers saw Hines—who was about 60 feet away—place a handgun into his left jacket pocket. They then saw Hines walk along Orange Street and enter a liquor store. Because Small was busy with two people he had detained on an unrelated matter, Romero used his cellular telephone to call Officer William Johnson, who came to the corner of Orange and Nesbitt Streets. When Johnson arrived, he and Romero entered the liquor store, approached Hines, and patted his left jacket pocket. When Romero felt what he believed was a weapon, the two officers threw Hines to the floor, placed him in handcuffs, and removed from his pocket a loaded semi-automatic handgun.

In February of 2008, a federal grand jury returned a one-count indictment charging Hines with possession of a firearm as a convicted felon. Before trial, Hines filed a document captioned "Motion to Suppress of Jerome Hines," which alleged that the police reports of his arrest were ambiguous and inconsistent, but which did not actually

3

request suppression of any item of evidence. Rather, the body of the document requested an evidentiary hearing and explained that if a hearing were held, and if sufficient facts were to emerge at the hearing, Hines would move to suppress the handgun "[a]t that point." (App. 24.) Page two of the motion also included a footnote stating that the contents of the police reports from Hines's arrest were "assumed to be true for the purposes of this motion"—i.e., the "Motion to Suppress of Jerome Hines." (App. 15.) The government opposed the motion, arguing that because Hines's footnote made the reports' factual contents undisputed, and because those contents established probable cause to arrest Hines, there was no basis for an evidentiary hearing regarding suppression. Hines filed a reply letter to which he attached a short affidavit, the contents of which tended to refute the police reports. The District Court denied Hines's request for a hearing and admitted the handgun into evidence. In April of 2009, a jury found Hines guilty.

At sentencing, the District Court calculated Hines's Guidelines range to be 92 to 115 months' imprisonment, based upon a final offense level of 24 and a criminal history category of V. It based this calculation in part on four of Hines's five prior convictions for violating New Jersey Statute § 2C:33-2.1(b), which makes it a misdemeanor to loiter in a public place with intent to obtain or distribute a controlled substance. The Court imposed a sentence of 92 months. Hines's timely appeal challenges the District Court's denial of an evidentiary hearing and the District Court's decision to include his prior convictions in calculating his criminal history score.

4

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231, because Hines was charged with offenses against the United States. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2).

## III.

We review for abuse of discretion a district court's denial of an evidentiary hearing on a motion to suppress. See, e.g., In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 157, 165 (2d Cir. 2008) ("The denial of a defendant's request for a suppression hearing is reviewed for abuse of discretion."); United States v. Howell, 231 F.3d 615, 620 (9th Cir. 2000) ("We review for an abuse of discretion a court's decision whether to conduct an evidentiary hearing on a motion to suppress."); United States v. Glass, 128 F.3d 1398, 1408-09 (10th Cir. 1997) ("We review a trial court's denial of an evidentiary hearing on a motion to suppress for abuse of discretion."); cf. United States v. Brink, 39 F.3d 419, 425 (3d Cir. 1994) (requiring a hearing where a defendant stated a colorable claim that evidence should be suppressed).

We review de novo a district court's interpretation of the Guidelines, United States v. Mateo, 560 F.3d 152, 154 (3d Cir. 2009), and we review for clear error the factual findings that underpin a district court's application of the Guidelines, United States v. McQuilkin, 97 F.3d 723, 727 (3d Cir. 1996). The meaning of "loitering," as used in the Guidelines, is a question of law subject to plenary review. See id.; see also United States v. Lock, 466 F.3d 594, 597-98 (7th Cir. 2006).

IV.

Hines contends first that the District Court should have held an evidentiary hearing before ruling on his document titled "Motion to Suppress of Jerome Hines." We begin by pausing to clarify what a defendant must show before a motion to suppress evidence requires an evidentiary hearing. Such rulings are ordinarily committed to a district court's sound discretion, which we reverse only in rare circumstances. Because we conclude that Hines did not make the requisite showing, we will affirm the District Court.

Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure permits defendants to file "motions to suppress evidence" before trial, but evidentiary hearings on such motions are not granted as a matter of course. See Rule 12(c) (the court "may" schedule a motion hearing). To require a hearing, a suppression motion must raise "issues of fact material to the resolution of the defendant's constitutional claim." United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996). A motion to suppress requires an evidentiary hearing only if the motion is sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress. See id. at 1067 (stating a claim is "colorable" if it consists "of more than mere bald-faced allegations of misconduct"); Brink, 39 F.3d at 424 (requiring an evidentiary hearing when a defendant states a colorable claim that the government obtained evidence by violating his constitutional rights). At bottom, the purpose of an evidentiary hearing in the context of a suppression motion is to assist the court in ruling upon a

defendant's specific allegations of unconstitutional conduct—its purpose is not to assist the moving party in making discoveries that, once learned, might justify the motion after the fact. To require an evidentiary hearing, a defendant's suppression motion therefore must set forth and identify for the court specific and concrete "issues of fact material to the resolution of the defendant's constitutional claim." Voigt, 89 F.3d at 1067.

In this case, Hines's motion did not state a claim, raise a material fact, or dispute the government's version of events. Given these failures, the District Court acted within its discretion in denying an evidentiary hearing.

A.

First, Hines's motion did not raise a constitutional claim. To raise a constitutional claim in a motion to suppress evidence, a defendant must state that a violation occurred and allege facts that, if true, would support a finding that the evidence in question was obtained in violation of the defendant's constitutional rights. Brink, 39 F.3d at 424 (remanding for a hearing because Brink alleged facts that, if true, "could violate a defendant's rights under the Sixth Amendment"). To satisfy this standard, a defendant's motion must identify a constitutional violation at the outset and connect it to the evidence in question; bare assertions that an as-yet unidentified violation may have occurred, without more, will not suffice. See United States v. Coleman, 149 F.3d 674, 677 (7th Cir. 1998).

Hines's motion did not make the required showing. Although captioned a "Motion to Suppress of Jerome Hines," it did not request suppression of anything at all. Rather, it

7

requested an evidentiary hearing for the sole purpose of determining the events leading to Hines's arrest. Hines apparently hoped that during the hearing he might make discoveries that would later permit him to contend that the arresting officers violated his constitutional rights:

> . . . Jerome Hines respectfully requests that a hearing beheld [sic] . . . . It is only with a hearing that the events surrounding his arrest can be clarified. . . . At that point, Mr. Hines will request that the weapon allegedly seized be suppressed and that the indictment then be dismissed.

(App. 23-24 ("Motion to Suppress of Jerome Hines").)

Nowhere did Hines's motion allege a violation of the Fourth Amendment; he merely speculated that he might discover one if the facts were "clarified." And nowhere did Hines's motion ask the District Court to suppress evidence; he merely indicated he might make such a request in the future. His uncertain speculation fell short of stating a constitutional claim because he did not actually "allege[] facts that, if true, could violate [his] rights." Voigt, 89 F.3d at 1067 (citing Brink, 39 F.3d at 424). Instead, the motion Hines filed essentially requested a hearing so that Hines could explore whether facts existed that would justify a hearing in the first place. The hearing, if granted, would have been an open-ended discovery expedition, unchained to any concrete allegation of fact and unguided by any clear principle of law. Because Hines did not meet his burden under Voigt, the District Court properly exercised its discretion to deny the hearing.

B.

Second, Hines's motion did not ask the District Court to rule on any material fact. In the context of a suppression motion, a defendant may raise an issue of material fact by submitting evidence that, if true, would tend to establish an essential element of his or her claim that evidence was obtained unconstitutionally. See Voigt, 89 F.3d at 1067. Here Hines effectively failed to raise any issue of fact. Further, his belated attempt to do so in a reply letter was misdirected because not every issue of fact is an issue of material fact.

Hines's motion agreed with the version of events that the government put forward. The motion stated in part: "The facts of the police documentation are assumed to be true for the purposes of this motion only." The motion summarized the police documentation:

> According to the incident report, Officers Romero and Small were "patrolling the area of Nesbitt St. and Orange St." when they observed Mr. Hines "attempting to conceal what appeared to be a black hand gun in his jacket left pocket." At that point, Officer Romero watched Mr. Hines enter a liquor store on Orange Street and called for back-up to meet at Nesbitt and Orange Streets. Officer Johnson arrived, and he and Officer Romero entered the liquor store and located Mr. Hines. They approached Mr. Hines, patted him down, and allegedly recovered a gun and bullets.

(App. 15 ("Motion to Suppress of Jerome Hines") (internal citations to police reports omitted)).

Hines therefore conceded that, for the purposes of

9

evaluating his motion, the District Court was to treat as true the events described in the police report, namely that (1) the officers saw Jerome Hines (2) display and then conceal a handgun in his pocket, and then (3) walk into a liquor store. These statements, if true, support the officers' conduct because they epitomize the essential elements of a permissible stop-and-frisk. See Terry v. Ohio, 392 U.S. 1, 27 (1968) (holding that an officer may make "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime"). Because Hines expressly instructed the District Court to assume those statements were true, and because if true they justified the officers' actions, Hines did not dispute the legality of the officers' conduct. Because he did not dispute the events that underpinned the legality of the officers' conduct, he did not show that "there [were] disputed issues of material fact which [would] affect the outcome of the motion." Coleman, 149 F.3d at 677. Thus, he failed to raise an issue of material fact.

After Hines filed his motion and the government responded, Hines submitted to the District Court a reply letter, to which he attached for the first time an affidavit tending to refute the police officers' version of events. The officers' reports stated they saw Hines display a handgun on Orange Street, and Hines's affidavit stated, among other things, "At no time on October 23, 2007, did I hold or otherwise have a gun in plain sight while on Orange Avenue [sic] in Newark." (App. 62.) Hines contends that, by creating conflicting versions of events, the affidavit operated to dispute material elements of the officers' reasonable suspicion to detain, and probable cause to search, him.

10

The affidavit failed to create an issue of material fact, however, because to do so there must be a claim for the evidence to be "material to" in the first place. And, to be "material," a fact must bear upon an essential element of the legal claim before the court. In this case, Hines did not assert the sine qua non of a suppression motion: he did not assert that evidence was so tainted by a constitutional violation that it should be suppressed. To be sure, Hines did contend before this Court that the affidavit tended to negate the officers' reasonable suspicion to detain him, but the actual text of his motion in the District Court failed to challenge the government on those points. The statements in Hines's affidavit—though they may have supported a claim that evidence should be suppressed—bore no legal relationship to the disposition of his motion, because the motion did not ask the District Court to suppress the handgun. Simply put, an affidavit cannot be material to a claim that is not stated. Accordingly, he did not create an issue of material fact. The affidavit had no bearing on the question before the District Court, and has no bearing on our review of its discretionary ruling. Given that there was no material factual dispute to resolve, there was no need for an evidentiary hearing. See Coleman, 149 F.3d at 677. The District Court was thus within its discretion when it declined to hold one.

We emphasize that the procedure for a defendant who seeks an evidentiary hearing on a suppression motion is to (1) state a colorable legal claim, (2) identify facts material to that claim, (3) show why the facts are disputed, and then (4) request a hearing to resolve the dispute. From our analysis it does not follow, however, that the District Court could not have exercised its discretion to hold a hearing if it wanted to do so. We hold only that, given the motion's defects, the

11

District Court acted within its discretion when it declined to hold a hearing.

## V.

Hines contends next that the District Court incorrectly calculated his criminal history score when it counted his four prior convictions under New Jersey Statute § 2C:33-2.1(b) ("Loitering for purpose of illegally using, possessing or selling controlled substance"). The Sentencing Guidelines provide that loitering offenses "and offenses similar to them, by whatever name they are known," shall not be counted in determining a defendant's criminal history score. U.S.S.G. § 4A1.2(c)(2). Hines's position is that the District Court should not have counted his convictions under § 2C:33-2.1(b) because they are "similar to" loitering under U.S.S.G. § 4A1.2(c)(2).

Because the core of our inquiry is whether New Jersey Statute § 2C:33-2.1(b) is "similar to" loitering, as the word appears in U.S.S.G. § 4A1.2(c)(2), we begin by examining and defining the meaning of each. We then apply a five-part balancing test pursuant to a recent amendment by the Sentencing Commission and conclude that § 2C:33-2.1(b) is not "similar to" loitering, as used in the Guidelines.

## A.

Four of Hines's prior convictions are under § 2C:33-2.1(b), which prohibits "[l]oitering for [the] purpose of illegally using, possessing or selling [a] controlled substance." More particularly, the statute provides:

12

A person, whether on foot or in a motor vehicle, commits a disorderly persons offense if

(1) he wanders, remains or prowls in a public place with the purpose of unlawfully obtaining or distributing a controlled dangerous substance or controlled substance analog; and

(2) engages in conduct that, under the circumstances, manifests a purpose to obtain or distribute a controlled dangerous substance or controlled substance analog.

N.J. Stat. Ann. § 2C:33-2.1(b). The New Jersey statute therefore targets "loitering plus"—by which we mean in this case loitering combined with the specific intent to obtain or distribute a controlled substance unlawfully—and not "loitering simpliciter," by which we mean simple loitering, without qualification.

The word "loitering" in the Guidelines, in contrast, refers to loitering simpliciter. We so conclude for three reasons. First, the Guidelines' plain text says only "loitering," and nothing more. § 4A1.2(c)(2). Black's Law Dictionary defines "loitering" as the "criminal offense of remaining in a certain place (such as a public street) for no apparent reason." Black's Law Dictionary 1027 (9th ed. 2009). The Model Penal Code's description is substantially similar: "A person commits a violation if he loiters or prowls in a place, at a time, or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity." Model Penal Code § 250.6 (2001). Thus, the plain text of the Guidelines suggests that what they describe is loitering simpliciter.

13

Second, the word "loitering" appears in the Guidelines among a list predominated by petty status offenses, such as hitchhiking, truancy, public intoxication, and vagrancy. This strongly suggests that, in drafting the Guidelines, the Commission was contemplating loitering in the least-culpable sense. See United States v. Martinez, 905 F.2d 251, 253 (9th Cir. 1990) (concluding that § 4A1.2(c)(2) comprises offenses of "minor significance"). To read "loitering" to include specific intent crimes (such as New Jersey Statute § 2C:33-2.1(b)) would lend it a meaning disharmonious with its statutory context.

Third, although Hines urges us to treat the word "loitering" in the Guidelines as describing more than loitering simpliciter, to do so would place us at odds with one of the paramount purposes of the Sentencing Reform Act of 1984, which is to "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records." 28 U.S.C. § 991(b)(1)(B). An analysis that construes the Guidelines' use of "loitering" to embrace more than loitering simpliciter would create uncertainty and likely would produce disparate results. Our survey of loitering offenses under statutes across the country finds a panoply of laws as varied as the reasons people loiter. In New York, for example, loitering statutes range from loitering to possess or use drugs, N.Y. Penal Law § 240.36 (McKinney 2008), to loitering for prostitution, id. § 240.37. Similarly, in California, to "'[l]oiter' means to delay or linger without a lawful purpose for being on the property and for the purpose of committing a crime as opportunity may be discovered." Cal. Health & Safety Code § 11530. California applies this broad definition in prohibiting not only loitering for the purpose of buying or

14

selling controlled substances, id. § 11532, but also loitering by minors near gambling establishments, Cal. Bus. & Prof. Code § 19921, loitering near posted industrial property, Cal. Penal Code § 554, loitering while peering into windows, id. § 647(i), loitering about adult schools, id. § 647b, loitering near children's schools by sex offenders, id. § 653b, loitering for prostitution, id. § 653.22(a), loitering in obstruction of bicycle pathways, Cal. Veh. Code § 21211(a), and loitering in or around public transit facilities, Cal. Pub. Util. Code § 120451. Suffice it to say, to read "loitering" under the Guidelines more broadly than the straightforward definition implied by the plain text would raise more difficulties than it would resolve—a result that would hardly lend "certainty and fairness" to our inquiry. 28 U.S.C. § 991(b)(1)(B). In our view, the vast array of loitering statutes, and the lack of indication that the Commission intended the Guidelines to refer to all or any of them, means that the only fair and certain way to avoid unwarranted disparities is to hold that the Guidelines mean what the Guidelines say: the simple status offense of loitering simpliciter.

In sum, we conclude that the New Jersey statute targets "loitering plus," in that a person violates it only if he "wanders, remains or prowls in a public place" while manifesting a specific intent to buy or sell a controlled or dangerous substance. "Loitering," as that term is used in the Guidelines, however, means only loitering simpliciter. A person loiters, within the meaning of the Guidelines, merely by wandering, prowling, or remaining in a public place.

B.

Turning to the application of the Guidelines, the default rule is that courts, when calculating a criminal history

15

score, should count prior misdemeanor convictions except when the Guidelines expressly provide for exclusion. U.S.S.G. § 4A1.2(c). To this end, the Guidelines expressly list nine types of misdemeanor and petty offenses, stating that they, "and offenses similar to them, by whatever name they are known, are never counted." § 4A1.2(c)(2). The list includes "[l]oitering." Id.

The question in this case turns on "similar to." Id. Our decision in United States v. Elmore, 108 F.3d 23, 27 (3d Cir. 1997), has traditionally guided courts in this judicial circuit in their analysis of similarity under § 4A1.2(c)(2). In Elmore, we were asked to determine whether a defendant's prior convictions for possession of drug paraphernalia, assault, and harassment, should have been counted in his criminal history score, or whether they were "similar to" disorderly conduct, which the Guidelines explain should not be counted. Id. at 25. Stating that the "apparent concern of the Guidelines" was that courts might count an offense identical to those in the enumerated list, merely because the offense happened to go by a different name under state law, we held that courts should evaluate similarity by looking to the elements of the offense itself, rather than simply the name by which it is known. Id. at 27.

We recognized in Elmore that not all of our sister Courts of Appeals shared our approach. We noted that when the Court of Appeals for the Fifth Circuit in United States v. Hardeman, 933 F.2d 278 (5th Cir. 1991), was asked whether driving without insurance was "similar to" driving without a license, it used a multi-factor approach that looked to "all possible factors of similarity," including the respective punishments, levels of culpability involved, and the degree to

16

which commission of the offenses indicated a likelihood of recurring criminal conduct. Elmore, 108 F.3d at 27. In a similar inquiry, the Court of Appeals for the Seventh Circuit considered the Hardeman factors, but emphasized the "circumstances surrounding" and the "factual basis for" the defendant's prior conduct, as well as the amount of punishment he actually received. United States v. Booker, 71 F.3d 685, 690 (7th Cir. 1995). The Court of Appeals for the Ninth Circuit, in contrast, asked whether the conduct underlying a prior conviction was "universally regarded as culpable," and whether it was a predictor of recurring criminal conduct. United States v. Martinez, 905 F.2d 251, 254 (9th Cir. 1990).

In 2007, the Sentencing Commission took note of the divergent approaches in the Courts of Appeals and published an amendment designed to unify them. The Guidelines now prefer Hardeman's broad, multi-factor approach. U.S.S.G. § 4A1.2 cmt. n.12(A). As framed by the Commission, those factors are: "(1) a comparison of punishments imposed for listed and unlisted offenses; (2) the perceived seriousness of the offense as indicated by the level of punishment; (3) the elements of the offense; (4) the level of culpability involved; and (5) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct." Id. Put another way, our inquiry is now "Elmore-plus," in that we continue to consider the elements of the offenses, but now examine four other factors as well. We consider them in turn.

1.

The Guidelines instruct us to begin by comparing the punishments imposed for the offense listed in the Guidelines (i.e., "loitering"), and the offense for which the defendant has

17

been convicted (i.e., § 2C:33-2.1(b)). U.S.S.G. § 4A1.2 cmt. n.12(A)(i).

Violations of § 2C:33-2.1(b) carry a potential punishment of six months in jail and a $1000 fine. N.J. Stat. Ann. §§ 2C:43-3(c), 2C:43-8. Simple loitering, however, carries no punishment in New Jersey because New Jersey has repealed its basic loitering law. See N.J. Stat. Ann. § 2A:170-1 (repealed Sept. 1, 1979). Because "no punishment" is different from "six months in jail and a $1000 fine," the government would have us conclude the offenses are not similar.

We agree, but not for the reason the government suggests. Section 4A1.2(c)(1) of the Guidelines, which precedes the section in which "loitering" appears, explains that misdemeanor offenses are not counted unless "the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days." Thus, a misdemeanor that might qualify for exclusion nonetheless is countable under the Guidelines if it involves more than thirty days' imprisonment or one year of probation. The Guidelines therefore suggest that offenses punishable by more than thirty days' imprisonment are not "similar to" offenses punishable by thirty days or less.

Because the potential six-month jail sentence for violating § 2C:33-2.1(b) is greater than the thirty-day line the Commission drew, we conclude § 2C:33-2.1(b) is not "similar to" loitering simpliciter under the first factor.

2.

The Guidelines next instruct us to examine how

18

serious Hines's prior offenses were, as indicated by the punishment he actually received. U.S.S.G. § 4A1.2 cmt. n.12(A)(ii); Hardeman, 933 F.2d at 282 (examining the punishment actually imposed for prior offenses). This factor, as the government's brief concedes, redounds in Hines's favor: he received a series of sentences ranging from 10 to 90 days in jail, all of which were suspended. The light penalties imposed for his offenses were therefore highly similar to the penalties one would receive for committing the type of minor offense that the Guidelines do not count. See § 4A1.2(c)(2). The second factor therefore suggests that § 2C:33-2.1(b) is "similar to" loitering.

3.

The third factor under the Guidelines' five-part inquiry requires us to compare the elements of loitering simpliciter with the elements of § 2C:33-2.1(b). U.S.S.G. § 4A1.2 cmt. n.12(A)(iii). Even though New Jersey state law defines Hines's predicate offenses and sentence, the classification of each offense as excluded or included under U.S.S.G. § 4A1.2(c) is a matter of federal law. Booker, 71 F.3d at 688-689. In construing the elements of the respective statutes, we therefore interpret New Jersey's statute according to state law and the Guidelines according to federal law. Elmore, 108 F.3d at 25 (citing Taylor v. United States, 495 U.S. 575 (1990)).

New Jersey Statute § 2C:33-2.1(b) targets people who loiter in public for the purpose of buying or selling controlled or dangerous substances. It requires a specific intent—subjectively held and objectively manifested—in addition to the mere act of wandering, remaining, or prowling in a public place. It therefore targets "loitering plus" the specific intent to

19

engage in a drug crime.

As we have discussed above, "loitering," within the meaning of the Guidelines, requires no mens rea element at all. It is mere loitering simpliciter, which is little more than suspiciously remaining in a public place, and requires no specific intent element at all. Given the presence of a specific intent element in the New Jersey statute, the elements of the offenses are not "similar to" each other for the purposes of this portion of the Guidelines' balancing test.

Hines makes two arguments to the contrary. The first is based on City of Chicago v. Morales, 527 U.S. 41, 57-58 (1999), in which the Supreme Court acknowledged that state courts had "uniformly invalidated" for vagueness laws that did not combine loitering simpliciter with some other overt act or evidence of criminal intent. Meanwhile, the Guidelines, Hines points out, continue to characterize loitering as an "offense." § 4A1.2(c)(2). Hines contends that because simple loitering cannot be criminalized after Morales, and because the Guidelines are concerned only with "offenses," the word "loitering" in the Guidelines must mean "loitering plus." Under that approach, he urges us to hold that his convictions under the New Jersey statute must be "similar to" the "offense of" loitering under the Guidelines, and therefore not counted in his criminal history score. Although we are aware that other Courts of Appeals have been persuaded by this argument, e.g., United States v. Lock, 466 F.3d 594, 602 (7th Cir. 2006) (holding that after Morales, "loitering" under the Guidelines is similar to loitering with intent to purchase or sell drugs), we are not. To accept that argument is to accept the premise that the 1999 Morales decision changed the meaning of the word "loitering" as it was published in the

20

Guidelines in 1987. That we will not do. When the Commission described the offense of loitering in 1987, it was describing loitering simpliciter; that after Morales statutes criminalizing simple loitering may be unconstitutionally vague does not change the fact that loitering simpliciter was an offense when the Commission drafted the Guidelines. The concept the Guidelines described then remains the concept they describe now: loitering simpliciter. Cf. Harris v. United States, 536 U.S. 545, 556 (2002) (explaining that changes in constitutional law do not change the meaning of statutory terms). Section 2C:33-2.1(b), which targets conduct substantially more culpable than "loitering" as the Guidelines employed the term in 1987, contains a specific intent element that is absent from loitering simpliciter. We remain convinced that this renders them dissimilar under this portion of our inquiry.

He also contends that because § 2C:33-2.1 is similar to other loitering statutes in force across the United States, it must also be similar to "loitering" as the word appears in the Guidelines. Hines misapprehends the relevant question, however, which is one of federal—not state—law. See Elmore, 108 F.3d at 25. Even if it were true that § 2C:33-2.1 is "similar to" all state loitering statutes across the country (and we have our doubts), it would not follow that the New Jersey statute is "similar to" what the Guidelines mean, as a matter of federal law. What Hines must show under this portion of the balancing test is that the elements of the New Jersey state statute are similar to the elements of the federal definition of loitering simpliciter. State statutes from other jurisdictions cannot help him to do so.

In sum, because the elements of § 2C:33-2.1(b)

21

include a specific intent element that is absent from the non-culpable status crime described by loitering simpliciter, we hold that the elements of § 2C:33-2.1(b) are not "similar to" the elements of loitering under the Guidelines.

4.

We next turn to a comparison of the level of culpability involved when loitering in violation of § 2C:33-2.1(b) versus "loitering" as the Guidelines use the term. § 4A1.2 cmt. n.12(A)(iv).

Culpability is another way of describing the mens rea a statute requires of each material element of an offense. See United States v. Zats, 298 F.3d 182, 189 (3d Cir. 2002) (describing mens rea as comprising "level[s] of culpability"); Black's Law Dictionary 435 (9th ed. 2009) (citing Model Penal Code § 2.02 (2001)). Courts of Appeals in other circuits generally hold that if the mens rea of two offenses are divergent, the offenses are not similar. E.g., United States v. Hernandez-Hernandez, 431 F.3d 1212, 1222 (9th Cir. 2005). This is consistent with our own decision in Elmore, in which we held that if the mens rea elements of two offenses are dissimilar, so too are the offenses themselves. Elmore, 108 F.3d at 25. We must therefore compare the mens rea required to violate § 2C:33-2.1(b) with the mens rea requirement of loitering simpliciter.

In this case, loitering simpliciter requires merely being in a public place with no apparent purpose. Black's Law Dictionary 1027 (9th ed. 2009). It therefore has no specific intent. In contrast, § 2C:33-2.1(b) requires waiting in a public place with the specific purpose and intent to buy, sell, or possess controlled substances. The New Jersey statute thus

22

contains a specific intent element that distinguishes it from loitering simpliciter. Accordingly, we conclude that the culpability requirements are divergent enough to render the offenses dissimilar under this portion of the Guidelines' balancing test.

5.

The final factor the Guidelines ask us to consider is the degree to which Hines's convictions under § 2C:33-2.1(b) indicate a likelihood of recurring criminal conduct. U.S.S.G. § 4A1.2 cmt. n.12(A)(v).

Because a primary goal of the Guidelines is to reduce recidivism, see 18 U.S.C. § 3553(a)(2), the more a violation indicates recurring criminal conduct, the more likely the Guidelines are to include it in a prior history score. Accordingly, the less a violation of § 2C:33-2.1(b) indicates recurring criminal conduct, the more likely it is "similar to" a non-countable offense like loitering simpliciter.

A significant part of § 2C:33-2.1(b) addresses controlled substances. It is, in essence, a drug statute— indeed, one cannot violate the statute without objectively manifesting a subjective intent to purchase or sell controlled substances. The Sentencing Commission has determined that convictions for crimes involving illegal narcotics correlate strongly to recidivism. See U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, 13, 29-30 (2004) (finding that 21.2% of defendants sentenced for drug trafficking recidivate). Hines thus stands convicted under a statute that targets people who intend to buy or sell controlled substances, and the Sentencing Commission has indicated that such

people, once convicted, tend to recidivate. This leads us to conclude, based on the Guidelines, that a violation of § 2C:33-2.1(b) "indicates a likelihood of recurring criminal conduct," § 4A1.2 cmt. n.12(A)(v), a conclusion which finds support in Hines's very status as a five-time repeat offender under this statute alone.

On balance, of the five factors set out in Hardeman and endorsed by the Sentencing Commission, only one—the degree of punishment Hines received for his violations—suggests that his offenses are "similar to" loitering. That is not enough in this case to overcome the other four. We hold that § 2C:33-2.1(b) is not "similar to" loitering under the Guidelines, which describe loitering simpliciter. Accordingly, we will affirm the District Court's application of the Guidelines.

* * * * *

The judgment of the District Court will be affirmed.

24