NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1245
_____

UNITED STATES OF AMERICA

v.

TERRELL K. CARTER,
                                        Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 08-cr-00262-001)
District Judge:  Hon. John E. Jones, III
_____

Submitted Under Third Circuit LAR 34.1(a)
September 10, 2013

Before:   RENDELL, JORDAN and GREENAWAY, JR., *Circuit Judges*.

(Filed: September 12, 2013)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Terrell K. Carter appeals a sentence of 115 months in prison imposed by the

United States District Court for the Middle District of Pennsylvania.  For the following

reasons, we will affirm.

## I.    Background

Carter and three co-conspirators – co-defendant Jovan Williamson and unindicted co-conspirators Jacinda Bonilla and Trista Falls – agreed to rob the Altoona First Savings Bank (the "Altoona Bank" or the "Bank"), in Altoona, Pennsylvania.  The group stole a car in Williamsport, Pennsylvania, and, in the early morning hours of November 16, 2007, drove it from Williamsport to Altoona to carry out the conspiracy.  After arriving in Altoona, Falls returned home, and the remaining co-conspirators attempted to rob the Bank.  Shortly before 9:00 a.m., Carter and Williamson placed a blue bag near the rear of the Bank.  While Carter waited behind the Bank in the stolen car, Williamson phoned in a bomb threat, telling a Bank employee that "he had put three bombs on the roof and two outside and that he was a professional and that [she] needed to follow his directions or else he was going to blow up the bank."  (App. at 147.)  Frightened by the bomb threat, Bank employees immediately evacuated and locked the building, thwarting the robbery attempt.  The co-conspirators returned to Williamsport empty handed.

Several months later, a federal grand jury in the Middle District of Pennsylvania indicted Carter, charging him with one count of Hobbs Act conspiracy to commit robbery, in violation of 18 U.S.C. § 1951, for the attempted robbery of the Altoona Bank, one count of using force, violence, and intimidation to steal $8,500 in a separate bank robbery in Jersey Shore, Pennsylvania, in violation of 18 U.S.C. §§ 2113(a) and (d), and additional charges that are not relevant to this appeal.  Carter pleaded not guilty to all counts.  The jury found him guilty of conspiring to rob the Altoona Bank, but it was unable to reach a verdict on the charge pertaining to the Jersey Shore bank robbery.  He

2

was acquitted of all other charges. In the face of a retrial for the Jersey Shore robbery charge, Carter reached a plea agreement with the government as to that charge.[1]

With respect to the conviction for Hobbs Act conspiracy to rob the Altoona Bank, Carter filed a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, arguing that venue did not lie in the United States District Court for the Middle District of Pennsylvania, where he was tried, because the Altoona Bank is located in the Western District. The District Court denied that motion, concluding that venue was proper because, "while it is true that the victim was located in the Western District," some conspiratorial conduct took place in Williamsport, which is in the Middle District. (App. at 5.)

The United States Probation Office prepared a presentence report ("PSR") that included a number of calculations based on the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."). Of relevance to this appeal, Carter challenged a determination in the PSR that the bomb threat constituted a threat of death, justifying a two-level increase in his offense level pursuant to U.S.S.G. § 2B3.1(b)(2)(F). He also objected to the addition of two criminal history points, which elevated his criminal history category from V to VI, for his 2002 conviction under a Pennsylvania statute that prohibits "malicious[] loiter[ing] or malicious[] prowl[ing]" at night "around a dwelling house or any other place used wholly or in part for living or dwelling purposes, belonging to or occupied by another." 18 Pa. Cons. Stat. Ann. § 5506 (the "Malicious Loitering

---

[1] As part of the plea agreement, Carter agreed to waive any appeal pertaining to the Jersey Shore robbery charge.

Statute"). Carter argued that the inclusion of his conviction under the Malicious Loitering Statute in calculating his criminal history score was improper because U.S.S.G. § 4A1.2(c)(2) provides that "[l]oitering" offenses, or offenses that are "similar to" loitering, "by whatever name they are known, are never counted" in computing a criminal history score.

Prior to the sentencing hearing, the District Court ruled on Carter's objections to the PSR. Although the Court sustained some of his objections, it overruled his objections to the offense level enhancement for using a threat of death and to the increase in his criminal history score for the conviction under the Malicious Loitering Statute. After the Court ruled on all of Carter's objections, the Probation Office submitted an updated advisory sentencing guideline range of 92 to 115 months in prison, based on an offense level of 23 and a criminal history category of VI. At the conclusion of the sentencing hearing, the District Court imposed a sentence of 115 months in prison, a $200 special assessment, three years of supervised release, and $8,500 in restitution for the Jersey Shore bank robbery.

Carter then filed this timely appeal.

## II.   Discussion[2]

On appeal, Carter reasserts three arguments that were rejected by the District Court.  First, he claims that venue in the Middle District was improper because the government's evidence failed to "establish that any substantial step in the attempted robbery of the Altoona Bank occurred" there.  (Appellant's Br. at 10.)  Second, he insists that the bomb threat did not constitute a threat of death because none of the Altoona Bank employees actually saw any bomb and none testified that they feared they might die.  Finally, he argues again that his 2002 conviction under the Malicious Loitering Statute should not have been used to increase his criminal history score.  We examine those arguments in turn.

### A.    *Venue*

The Hobbs Act does not contain a specific venue provision.  When Congress has "not indicate[d] where [it] consider[s] the place of committing the crime to be," we determine venue "from the nature of the crime alleged and the location of the act or acts constituting it."  *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 & n.1 (1999) (quoting *United States v. Anderson*, 328 U.S. 699, 703 (1946)) (internal quotation marks

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).  "On appeal from the grant or denial of a motion for judgment of acquittal, this Court exercises plenary review and independently applies the same standard as the district court."  *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).  "[W]e exercise plenary review over the District Court's venue determination."  *United States v. Pendleton*, 658 F.3d 299, 302 (3d Cir. 2011).  Finally, "[w]e review the District Court's interpretation of the Sentencing Guidelines *de novo*, and scrutinize any findings of fact for clear error."  *United States v. Cespedes*, 663 F.3d 685, 688 (3d Cir. 2011) (quoting *United States v. Aquino*, 555 F.3d 124, 127 (3d Cir. 2009) (internal quotation marks omitted).

5

omitted). The Hobbs Act criminalizes not only robberies that affect interstate commerce, but also attempts and conspiracies to commit such robberies. *See* 18 U.S.C. § 1951(a) (subjecting to criminal penalty anyone who "in any way or degree obstructs, delays, or affects commerce … by robbery … or attempts or conspires so to do"). Carter was convicted of conspiracy to commit Hobbs Act robbery, and the essential elements of such a conspiracy are "(1) a shared unity of purpose, (2) an intent to achieve a common goal, … (3) an agreement to work together toward the goal," *United States v. Perez*, 280 F.3d 318, 342 (3d Cir. 2002) (internal quotation marks omitted), and (4) the commission of an overt act to further the conspiracy, *United States v. Manzo*, 636 F.3d 56, 66 (3d Cir. 2011). "When the crime consists of distinct acts occurring in different places, venue is proper where any part of the crime occurs." *United States v. Pendleton*, 658 F.3d 299, 303 (3d Cir. 2011); *see also* 18 U.S.C. § 3237(a) (providing that when any offense is begun in one district and completed in another, or committed in more than one district, venue will lie in each).

We agree with the District Court that Carter and his co-conspirators committed overt acts in furtherance of their Hobbs Act conspiracy in the Middle District. They stole a car in Williamsport and used it in the attempted robbery. Moreover, they congregated in Williamsport in the early morning hours, and traveled from there to Altoona to commit the robbery. Given that "[v]enue in the prosecution for conspiracy may be laid in any district in which any act in furtherance thereof was committed by any of the conspirators," *United States v. Cohen*, 197 F.2d 26, 28 (3d Cir. 1952) (internal quotation

marks omitted), the District Court did not err in determining that those overt acts established venue in the Middle District.

      B.     *The "Threat of Death" Enhancement*

Section 2B3.1(b)(2)(F) of the Guidelines calls for a two-level increase in a defendant's offense level if, during the commission of the relevant offense, the defendant made "a threat of death." A defendant need not "directly indicate that [he] intends to kill or otherwise cause the death of the victim" to trigger § 2B3.1(b)(2)(F). *United States v. Figueroa*, 105 F.3d 874, 878 (3d Cir. 1997) (quoting *United States v. Alexander*, 88 F.3d 427, 431 (6th Cir. 1996)) (internal quotation marks omitted). Rather, when determining the existence of a "threat of death," we focus on the "reasonable response of the victim of the threat." *United States v. Thomas*, 327 F.3d 253, 255 (3d Cir. 2003); *see also* U.S.S.G. § 2B3.1(b)(2)(F) cmt. 6. ("The court should consider that the intent of this provision is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a reasonable person, who is a victim of the offense, a fear of death."). Under that standard, we have held that a robber's mere statement that he has a gun triggers the enhancement, even if unaccompanied by a specific death threat, because, "[w]hen a robber announces, by word or by action, that he possesses a gun, he also is communicating to the reasonable victim his intention to use that weapon." *Figueroa*, 105 F.3d at 879. Even oblique threats can qualify for the "threat of death" enhancement. *See Thomas*, 327 F.3d at 254 (holding that the following note was a death threat for purposes of sentencing: "Do exactly what this says, fill the bag with $100s, $50s and $20s, a dye

7

pack will bring me back for your ass, do it quick now." (internal quotation marks omitted)).

It is true, as Carter points out, that "[n]one of the bank employees observed a bomb" (Appellant's Br. at 11), but that does not mean that they did not have a reasonable fear of death. In fact, there can be little doubt that the bomb threat constituted a threat of death. As the Altoona Bank employee who answered the threatening call testified at trial, co-defendant Williamson said that he had placed five bombs on or around the building, that "he was a professional," and that if she disobeyed his instructions he would "blow up the bank." (App. at 147.) If those facts were true (and, thankfully, none were), the Altoona Bank employees were in imminent threat of deadly peril. *See United States v. Bomski*, 125 F.3d 1115, 1118 (7th Cir. 1997) (finding a threat of death where the defendant "placed a bag on the counter and told the teller: 'this is a bomb', followed by 'give me all of your money'").

For the same reasons, it is of no moment that none of the Altoona Bank employees testified specifically at trial that they feared for their lives. Even if they did not explicitly say that they interpreted the phone call as a threat of death, and, indeed, even if these specific victims did not consider the situation life threatening (a circumstance that is unlikely given that they immediately evacuated the building), a "reasonable person" in their shoes would. U.S.S.G. § 2B3.1(b)(2)(F) cmt. 6; *see also Bomski*, 125 F.3d at 1118 (holding that a bomb threat qualified for the "threat of death" enhancement). The enhancement thus properly applies.

8

C.    *"Malicious Loitering"*

Under the Guidelines, "the default rule is that courts, when calculating a criminal history score, should count prior misdemeanor convictions except when the Guidelines expressly provide for exclusion." *United States v. Hines*, 628 F.3d 101, 109-10 (3d Cir. 2010). The Guidelines list eight types of misdemeanors and petty offenses for exclusion, stating that they, "and offenses similar to them, by whatever name they are known, are never counted." U.S.S.G. § 4A1.2(c)(2). The list includes "[l]oitering," *id.*, and Carter contends that the District Court thus erred in counting his 2002 conviction under the Malicious Loitering Statute. To succeed on his challenge, Carter must show either that the Malicious Loitering Statute embodies the type of loitering expressly excluded by § 4A1.2(c)(2) from the criminal history score calculation, or that it is sufficiently "similar to" it.

We confronted a similar challenge to a criminal history calculation in *Hines*. The defendant in that case argued that the district court had incorrectly calculated his criminal history score when it counted his four prior convictions under New Jersey's loitering statute, N.J. Stat. Ann. § 2C:33-2.1, which prohibits "[l]oitering for [the] purpose of illegally using, possessing or selling [a] controlled substance." We held in *Hines* that the type of "loitering" contemplated by § 4A1.2(c)(2) is far different from the one described in the New Jersey loitering statute. Whereas "loitering" in the Guidelines "refers to loitering *simpliciter*," defined as "the 'criminal offense of remaining in a certain place (such as a public street) for no apparent reason,'" *Hines*, 628 F.3d at 108 (quoting *Black's Law Dictionary* 1027 (9th ed. 2009)), or, in other words, "loitering in the least-culpable

9

sense," *id.* at 109, the New Jersey statute "targets 'loitering plus' – by which we mean … loitering combined with the specific intent to obtain or distribute a controlled substance unlawfully," *id.* at 108. Because "the Guidelines' plain text says only 'loitering,' and nothing more," we held that "the plain text of the Guidelines suggests that what they describe is loitering *simpliciter*," not loitering plus. *Id.* at 108-09.

Unlike the statute at issue in *Hines*, the Malicious Loitering Statute does not target loitering with the specific intent to obtain or distribute illegal narcotics. Pennsylvania courts have, however, interpreted the word "malicious[]" in the statute to require an "intentional act, without legal justification or excuse, which has as its purpose injury to the privacy, person or property of another." *Commonwealth v. De Wan*, 124 A.2d 139, 141 (Pa. Super. Ct. 1956); *see also Commonwealth v. Williams*, 137 A.2d 903, 905 (Pa. Super. Ct. 1958) (explaining that the term "maliciously" means "an intent to do a wrongful act and that it is also used to define that state of mind of a person who does a wrongful act intentionally and without legal justification or excuse" (internal quotation marks omitted)). Given that interpretive gloss placed on the Malicious Loitering Statute by Pennsylvania courts, we conclude that a conviction under that statute is not one for merely loitering *simpliciter*.

Next, we must evaluate whether the Malicious Loitering Statute is sufficiently "similar to" loitering *simpliciter* to render a conviction under it out of bounds for purposes of calculating a criminal history score. To determine whether an offense is sufficiently similar to an offense listed in § 4A1.2(c)(2), we apply a "multi-factor approach," using the following five factors: "(1) a comparison of punishments imposed

for listed and unlisted offenses; (2) the perceived seriousness of the offense as indicated by the level of punishment; (3) the elements of the offense; (4) the level of culpability involved; and (5) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct." *Hines*, 628 F.3d at 110 (quoting U.S.S.G. § 4A1.2 cmt. n.12(A)) (internal quotation marks omitted).

The first factor weighs against a finding of similarity in this case. A conviction under the Malicious Loitering Statute is a third-degree misdemeanor, 18 Pa. Cons. Stat. Ann. § 5506, which is punishable by "a term of imprisonment, the maximum of which is not more than one year," *id.* § 106(b)(8). In contrast, for a misdemeanor to qualify for exclusion under the Guidelines, it cannot "involve[] more than thirty days' imprisonment or [more than] one year of probation." *Hines*, 628 F.3d at 111 (citing U.S.S.G. § 4A1.2(c)(1)). Given that the maximum sentence for Carter's conviction is "more than thirty days' imprisonment," the Malicious Loitering Statute is not "similar to" loitering *simpliciter* under the first factor. *See Hines*, 628 F.3d at 111 (concluding that "[b]ecause the potential six-month jail sentence for violating [New Jersey's statute] § 2C:33-2.1(b) is greater than the thirty-day line the Commission drew, … § 2C:33-2.1(b) is not 'similar to' loitering *simpliciter* under the first factor").

The second factor also weighs against a finding of similarity. For his conviction under the Malicious Loitering Statute, Carter received a sentence of nine days to one year in prison. Although that sentence represents a broad range of possible punishment, it does entail at least some prison time, which distinguishes this case from *Hines*. *See Hines*, 628 F.3d at 111 (holding that "[t]he second factor … suggests that § 2C:33-2.1(b)

11

is 'similar to' loitering" because the defendant in that case "received a series of sentences ranging from 10 to 90 days in jail, all of which were suspended"). Given that Carter received actual jail time for his 2002 conviction, the second factor suggests that the Malicious Loitering Statute is not "similar to" loitering *simpliciter*.

The third factor requires us to compare the elements of loitering *simpliciter* with the elements of the Malicious Loitering Statute.[3] The Malicious Loitering Statute targets those who maliciously loiter or maliciously prowl around a dwelling at night time. 18 Pa. Cons. Stat. Ann. § 5506. As already noted, the statute requires that the loitering or prowling be done "maliciously" – in other words, with the specific intent to cause "injury to the privacy, person or property of another." *De Wan*, 124 A.2d at 141. In addition, the statute requires the loitering and prowling to take place "at night time" and "around a dwelling house or any other place used wholly or in part for living or dwelling purposes." 18 Pa. Cons. Stat. Ann. § 5506. In contrast, loitering *simpliciter* requires "little more than suspiciously remaining in a public place, and requires no specific intent element at all." *Hines*, 628 F.3d at 111-12. Given the requirements of specific intent and a specific time and place, the elements of the Pennsylvania statute are not "similar to" loitering *simpliciter*. *See id.* at 112 (concluding that, "because the elements of § 2C:33-2.1(b) include a specific intent element that is absent from the non-culpable status crime described by loitering *simpliciter*, … the elements of § 2C:33-2.1(b) are not 'similar to' the elements of loitering under the Guidelines").

---

[3] In evaluating this factor, we interpret the statute of the conviction "according to state law and the Guidelines according to federal law." *Hines*, 628 F.3d at 111.

Fourth, we compare the levels of culpability involved for each offense. "Culpability is another way of describing the mens rea a statute requires of each material element of an offense." *Hines*, 628 F.3d at 113. As a general matter, "if the mens rea of two offenses are divergent, the offenses are not similar." *Id.* Here, the mens rea of the two offenses are dissimilar, as "loitering *simpliciter* requires merely being in a public place with no apparent purpose," *id.*, while the Malicious Loitering Statute requires the specific intent to cause "injury to the privacy, person or property of another," *De Wan*, 124 A.2d at 141. The two offenses are accordingly dissimilar under the fourth factor. *See Hines*, 628 F.3d at 113 (holding that "the culpability requirements are divergent enough to render the offenses dissimilar under this portion of the Guidelines' balancing test").

Finally, the government concedes that the fifth factor actually suggests similarity, because neither type of conviction would indicate a likelihood of recurring criminal conduct. In *Hines*, by way of contrast, the defendant had been "convicted under a statute that targets people who intend to buy or sell controlled substances, and the Sentencing Commission has indicated that such people, once convicted, tend to recidivate." *Hines*, 628 F.3d at 113.

In sum, of the five factors, only one weighs in favor of concluding that the Malicious Loitering Statute is "similar to" loitering *simpliciter*. That is not enough to overcome the other four factors. *See Hines*, 628 F.3d at 113-14 (identifying one factor – the degree of punishment the defendant received for his loitering-plus violations – that weighed in the defendant's favor, yet holding that "[t]hat is not enough in this case to

13

overcome the other four" factors, and concluding that New Jersey's loitering statute, N.J. Stat. Ann. § 2C:33-2.1(b), "is not 'similar to' loitering under the Guidelines"). Accordingly, we conclude that the Malicious Loitering Statute is not "similar to" loitering *simpliciter*, and we see no error in the District Court's application of the Guidelines.

## III. Conclusion

For the foregoing reasons, we will affirm the sentence imposed by the District Court.