**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1265
_____

UNITED STATES OF AMERICA

v.

CHAKA FATTAH, JR.,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-14-cr-00409-001
District Judge: The Honorable Harvey Bartle, III

_____

Argued March 7, 2017

Before: SMITH, *Chief Judge,* HARDIMAN, and
KRAUSE, *Circuit Judges*

(Opinion Filed: June 2, 2017)

Eric L. Gibson         **[ARGUED]**
Paul L. Gray
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
    *Counsel for Appellee*

Chaka Fattah, Jr.        **[ARGUED]**
Philadelphia FDC
700 Arch Street
P.O. Box 562
Philadelphia, PA 19105
    *Pro Se Appellant*

Ellen C. Brotman[1]        **[ARGUED]**
Suite F200
150 North Radnor Chester Road
Radnor, PA 19087
    *Counsel for Court Appointed Amicus Curiae*

---

[1] Ms. Brotman was appointed by the Court to serve as Amicus Curiae on behalf of the defendant. We thank Ms. Brotman for her excellent advocacy, which she provided on an expedited basis.

_____

OPINION

_____

SMITH, *Chief Judge.*

On February 29, 2012, law enforcement officers executed sealed search warrants at the home and office of defendant Chaka Fattah, Jr. The search occurred more than two years before Fattah was indicted, but members of the press had somehow learned about the investigation; several reporters waited at Fattah's home to report the story. How did they find out? At Fattah's trial, an FBI agent admitted that he had, over the course of several months, disclosed confidential information to a reporter in exchange for information pertinent to the investigation.

Fattah argues that the FBI agent's conduct violated the Sixth Amendment because the pre-indictment press caused him to lose his job, which in turn rendered him unable to retain the counsel of his choice. Fattah also argues that the agent's conduct violated his Fifth Amendment right to due process. We conclude that neither argument prevails. As the Government concedes, the agent's conduct was wrongful. We are unable, however, to conclude that Fattah is entitled to relief.

Fattah also raises a number of additional claims regarding the sufficiency of the indictment, constructive amendment of the indictment, improper joinder of

3

counts, and the particularity of the search warrants. We reject those arguments as well. Accordingly, we will affirm the judgment of the District Court.

## I

On July 29, 2014, more than two years after the searches and media coverage described above, a grand jury returned an indictment charging defendant Chaka Fattah, Jr. with twenty-three counts: one count of bank fraud, in violation of 18 U.S.C. § 1344; eight counts of making false statements to obtain loans, in violation of 18 U.S.C. § 1014; one count of making false statements to settle a loan, in violation of 18 U.S.C. § 1014; three counts of making false statements concerning loans insured by the Small Business Administration, in violation of 18 U.S.C. § 1001; four counts of filing false federal income tax returns, in violation of 26 U.S.C. § 7206; one count of failing to pay federal income tax, in violation of 26 U.S.C. § 7203; one count of theft from a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A); four counts of wire fraud, in violation of 18 U.S.C. § 1343; and aiding and abetting, in violation of 18 U.S.C. § 2. A grand jury returned a Superseding Indictment with minor amendments on March 3, 2015.

The charges fall into three basic categories.

The first set of charges relate to Fattah's fraudulently obtaining and failing to repay lines of credit. In applying for lines of credit, Fattah represented to

4

various banks that his company, 259 Strategies, LLC, would use the money for business purposes when in fact Fattah intended to use the money for personal expenses like gambling debts, clothing, jewelry, a BMW, and liquor. Fattah also failed to disclose his outstanding debts and misrepresented facts about his company's operational status and financials. Fattah recruited his roommate, Matthew Amato, to make similar misrepresentations to obtain additional lines of credit. The Superseding Indictment also charges Fattah with making false statements to avoid repaying some of the banks.

Second, the Superseding Indictment charged Fattah with tax evasion. Specifically, Fattah failed to report certain income from his other businesses, including income from his sham concierge service, American Royalty. For example, Fattah accepted $10,000 from an eighteen-year-old after promising that American Royalty would obtain an American Express black card for the teenager. Fattah never did so; instead, he kept the money and failed to report it as income.

And third, the Superseding Indictment charged Fattah with defrauding the Philadelphia School District ("PSD"). Fattah's company, 259 Strategies, contracted with Delaware Valley High School ("DVHS"), a for-profit educational provider. Fattah thereafter became DVHS's Chief Operating Officer. DVHS, in turn, signed a $2.1 million contract with the PSD to run the "Southwest" school for troubled students. Through his

5

position at DVHS, Fattah submitted fraudulent budgets to the PSD that requested funding for nonexistent jobs and unperformed services. All told, the PSD overpaid $940,000 over a two-year period, and Fattah personally pocketed part of that sum.

Fattah declined representation from the Federal Community Defender Office for the Eastern District of Pennsylvania and has proceeded throughout this litigation pro se. Before trial began, Fattah filed a motion to dismiss the indictment. Among other accusations, Fattah alleged that the Government had leaked confidential information about the investigation to the press. Fattah argued, *inter alia*, that the Government's conduct violated his Fifth and Sixth Amendment rights. The District Court denied the motion, concluding that there was no evidence of a leak.

Trial commenced on October 15, 2015. On October 27, the FBI agent in charge of the investigation testified that he did in fact leak confidential information to a reporter in exchange for background information about the PSD. The agent explained that he had revealed the existence of sealed search warrants, provided the time and location of the search, discussed the content of undercover recordings, and gave specific information about Fattah's business dealings, including the amount of money he had been paid through his work.

After the agent's testimony, Fattah (through standby counsel) moved for a hearing to determine whether the Government violated grand jury secrecy or

6

its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). The District Court denied the motion.[2]

On November 5, 2015, a jury found Fattah guilty on all counts except one (Count 17, filing a false income tax return for the year 2009). On February 2, 2016, the District Court sentenced Fattah to serve sixty months' imprisonment and five years' supervised release, and to pay $1,172,157 in restitution plus a special assessment fee of $2,125. Fattah timely appealed. By Order dated January 23, 2017, the Court appointed Ellen C. Brotman as Amicus Curiae on behalf of Fattah.

## II[3]

We begin with Fattah's claims that the FBI agent's conduct violated Fattah's Sixth Amendment right to the counsel of his choice and violated his Fifth Amendment right to due process. We reject both arguments.

### A

Before reaching the merits of the Fifth and Sixth Amendment issues, we must first address the issue of

---

[2] Fattah does not challenge that denial on appeal.

[3] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

7

waiver.[4] We will not enforce waiver against either party.

"[I]t is well settled that arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review in this Court absent exceptional circumstances." *United States v. Rose,* 538 F.3d 175, 179 (3d Cir. 2008) (quoting *United States v. Lockett,* 406 F.3d 207, 212 (3d Cir. 2005)). When reviewing a district court's ruling on a pretrial motion, including a motion alleging "a defect in instituting the prosecution," Fed. R. Crim. P. 12(b)(3)(A), we will not consider any unpreserved arguments absent "good cause," Fed. R. Crim. P. 12(c)(3); *see United States v. Joseph*, 730 F.3d 336 (3d Cir. 2013); *Rose*, 538 F.3d at 182. This rule applies to criminal defendants and to the Government alike. *See, e.g.*, *United States v. Tracey*, 597 F.3d 140, 149 (3d Cir. 2010) ("[T]he Government waived

---

[4] In criminal procedure, the term "waiver" ordinarily refers to the intentional relinquishment of a known right, as distinct from "forfeiture." *See United States v. Olano*, 507 U.S. 725, 733 (1993). However, an earlier version of Rule 12 provided that a party "waives" a defense by simply failing to timely raise it. The reference to waiver was deleted in the 2014 Amendments to "avoid possible confusion." Fed. R. Crim. P. 12 advisory committee's note. To the extent that we repeat that terminology here, we use it in the sense embodied in the earlier version of Rule 12 and our case law—to refer to a party's failure to raise an argument—not in the sense of intentional relinquishment.

this argument by failing to raise it before the District Court.").

This case reaches us in an unusual posture. Fattah properly raised both his Fifth and Sixth Amendment claims in a pretrial motion. But at that time, the Government did not know about the leaks. It defended against Fattah's pretrial motion by arguing that the presence of reporters was insufficient evidence to justify an evidentiary hearing. The District Court agreed. But at trial, the agent's testimony confirmed Fattah's suspicion. With the assistance of standby counsel, Fattah filed a new motion for a hearing. But the new motion did not reraise the Fifth and Sixth Amendment issues. As a result, neither the Government nor the District Court substantively addressed those arguments.

Although the Government does not explicitly argue waiver, it still complains that Fattah relies on "arguments that were not presented to the district court at the appropriate time and were never addressed by the district court." Resp. to Amicus Br. 15. We nevertheless decline to enforce waiver against Fattah because "requiring a defendant to re-raise the issue[s] . . . would be an exercise in wasteful formality." *United States v. Sanders*, 485 F.3d 654, 657 (D.C. Cir. 2007). And given the late-breaking revelation of the agent's conduct, combined with Fattah's failure to reraise the arguments, we conclude that any waiver by the Government is excusable for good cause.

We proceed, then, to the merits.

9

B

Fattah's Sixth Amendment claim is premised on a novel theory and a long causal chain. The theory is that, even where the government's misconduct was undisputedly not directed towards attorneys' fees or intended to interfere with the defendant's right to counsel, a defendant may establish a Sixth Amendment violation by proving that the misconduct reduced his pre-indictment income and thereby impaired his ability post-indictment to hire the counsel of his choice. As for the causal chain, Fattah asserts that the FBI agent spoke to a reporter, which caused the publication of news stories about Fattah, which in turn caused DVHS to terminate Fattah's employment. According to Fattah, the unrealized income from that employment—allegedly $432,000 (plus bonus)—was necessary for him to afford counsel of his choice. Even if we were to accept Fattah's far-reaching theory, we decline to remand for an evidentiary hearing because Fattah's claim to unrealized income is contradicted by his own undisputed statements and actions.

1

The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment guarantees not only the right to effective assistance of counsel, *see, e.g.*, *Buck v. Davis*, 137 S. Ct. 759, 775 (2017), but also the "fair opportunity

to secure counsel of [one's] own choice," *Powell v. Alabama*, 287 U.S. 45, 53 (1932). "The right to select counsel of one's choice . . . has been regarded as the root meaning of the constitutional guarantee." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147–48 (2006). The Sixth Amendment protects the "fundamental" right "to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Luis v. United States*, 136 S. Ct. 1083, 1089 (2016) (plurality opinion) (citation omitted).

To argue that the deprivation of income constitutes a Sixth Amendment violation, Fattah principally relies on *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008). In *Stein*, the accounting firm KPMG and several of its employees were under federal investigation for allegedly creating tax shelters for their clients. At the time, the Department of Justice had a stated policy of considering whether a corporation "appears to be protecting its culpable employees" when deciding whether to bring criminal charges against the corporation. *Id.* at 136. In a meeting with KPMG's counsel, the prosecutors stated that they would take this policy "into account" regarding KPMG's decision to pay its employees' legal fees. *Id.* at 137. The prosecutors' statements pressured KPMG into withdrawing financial support for employees who were indicted. *Id.* at 139–40.

The district court in *Stein* found that the Government pressured KPMG into modifying its policy in order to "minimize the involvement of defense

11

attorneys," and, but for that conduct, "KPMG would have paid defendants' legal fees and expenses without consideration of cost." *Id.* at 141 (citation omitted). The district court ruled that the Government violated the defendants' Sixth Amendment rights, and the Second Circuit affirmed. The Second Circuit held that "the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain." *Id.* at 156. The Second Circuit also held that the Government's pre-indictment conduct had "post-indictment effects," and therefore implicated the Sixth Amendment even though the right to counsel attaches upon indictment. *Id.* at 153.

*Stein* tested the outer limits of the Sixth Amendment's protection. Fattah would have us extend those boundaries even further. Unlike *Stein*, the Government here undisputedly lacked any "desire" or "purpose" to "deliberately interfere" with counsel. *Id.* at 141, 153, 155. Any alleged loss of income would have been an unintended and incidental consequence of the agent's conduct. Also unlike *Stein*, DVHS decided to terminate Fattah's employment[5] independent of any influence from prosecutors. There was no "close nexus" between DVHS and the Government with regard to the

---

[5] The Government states that it is in possession of evidence that Fattah was never fired from DVHS, but instead decided not to return to work. We will, however, consider only evidence of record.

termination. *See id.* at 146–51. But we need not resolve the case on that basis. Based on the unique facts of this case, Fattah's claim fails for a more fundamental reason. Fattah's claim depends on the factual assertion that the Government deprived him of income that he otherwise would have "reasonably and lawfully obtain[ed]," *id.* at 156, but Fattah has failed to make an adequate preliminary showing to support that assertion. As such, he would not be entitled to an evidentiary hearing on his Sixth Amendment claim even if his broad-sweeping legal theory were cognizable.[6]

---

[6] On May 17, 2017, a district court denied the Government's motion for summary judgment in a parallel civil matter, *Fattah v. United States*, No. 14-cv-1092, 2017 WL 2152171 (E.D. Pa. May 17, 2017). The court held that "conflicting versions of why and how Fattah's business relationship with [DVHS] ended preclude summary judgment" because "[r]esolution of the conflict turns on a credibility determination to be made by the fact finder." *Id.* at *9. Our decision in this case is unrelated to that holding. Our conclusion is based on the minimal preliminary showing advanced in *this* criminal action, combined with gaps in Fattah's proffer specific to the Sixth Amendment context. Even if Fattah ultimately succeeds in his civil action, that would not mend the many inadequacies in his Sixth Amendment claim as presented to the District Court in this case. We describe those inadequacies in greater detail below.

Because of the procedural posture of this case, the District Court did not consider whether to hold an evidentiary hearing on Fattah's Sixth Amendment claim after the FBI agent testified. We conclude that, even if the issue had been reraised and considered by the District Court, Fattah would not have been entitled to a hearing.

To be entitled to an evidentiary hearing, the defendant's moving papers must be "sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010); *see also United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996).

To support his request for an evidentiary hearing, Fattah relies on an affidavit he filed in the District Court that attests to the truth of the representations presented in his pretrial Motion to Quash and Reply Brief. Those filings, in turn, assert that the Government "caused him to be without funds he would have earned which undoubtedly affect[ed] his choice of counsel and ability to mount a defense." DDE 34, at 98. Fattah claims that he "reasonably expected to continually receiv[e] his contract payments" in the amount of "more than $432,000 ($144,000 per year), plus a bonus of $117,000, prior to trial." Fattah Br. 15. (internal quotation marks omitted).

But as the Government argues, Fattah was preparing to leave DVHS on his own accord. The record discloses that Fattah sent an email to the school system mere days before the searches. The email asked whether a whistleblower would be entitled to a reward for revealing fraud. Meanwhile, Fattah had prepared a business plan to begin his own competing school, called Dreamchasers. Based on these facts, the Government argues that Fattah planned to reveal DVHS's fraud to eliminate a competitor and void a noncompete clause in his employment contract. In Fattah's own words, "when this all comes out I'm basically effectively resigned. I'm done. I was going to be on my way out the door anyway. I wanted to start my own thing and go after some opportunities." Supp. App. 89.

Fattah does not dispute that he prepared a business plan and sent the email. Nor does he deny making the foregoing statement. Thus, by his own account, Fattah was "going to be on [his] way out," *id.*, of the very job which he now claims he would have remained in for more than two years. Moreover, by sending the email, Fattah took a concrete step to undermine DVHS and his prospects of continued employment at the company. Accordingly, the undisputed record contradicts Fattah's claimed expectation of "continually receiving his contract payments" from DVHS. Fattah Br. 15.

Fattah attempts to resolve this contradiction by arguing that there is a material dispute of fact as to *when* he would have left DVHS. "My plan was to raise money

15

[for Dreamchasers], and if I didn't raise that money I would have stayed at Delaware Valley High School." Oral Arg. 9:29; *see also* Reply Br. 5–6. But according to that argument, Fattah's continued employment would be contingent on whether a hypothetical investor would have taken an interest in a hypothetical business. For Fattah's claim of $432,000 (plus bonus) in lost income to succeed, the District Court would have been required to speculate that no investor would have taken an interest in Dreamchasers over more than two years. Alternatively, the District Court would have been required to speculate that, if Fattah had succeeded in raising capital for Dreamchasers, the FBI agent's conduct thwarted what would have otherwise been a comparably successful business.

Fattah has not claimed to be in possession of any evidence that would enable the District Court to determine what contracts, if any, Fattah's nonexistent business might have won, or what income, if any, Fattah might have otherwise earned. Because there is no dispute that Fattah was going to leave DVHS, and the question of timing is speculative, Fattah has failed to show the existence of a material dispute of fact capable of resolution at an evidentiary hearing. Fattah's counterfactual ability to afford counsel is purely conjectural.

Fattah's claim is speculative for an additional reason. The Government executed a search warrant not only at Fattah's apartment, but also at his office located

16

in DVHS's headquarters. DVHS, therefore, did not learn about the investigation from the news media. The case agent testified that he thought David Shulick, DVHS's CEO, possessed a copy of the warrant, or at least "discussed receiving copies of the search warrant from whomever it was served at -- on DVHS." Supp. App. 370; *see* Fed. R. Crim. P. 41(f)(1)(B)–(C). Fattah did not proffer any testimony or other evidence to suggest that DVHS's decision to cut ties with Fattah was motivated by the news reports rather than by DVHS's independent knowledge of the investigation.

Finally, the money at issue in *Stein* would have *directly* funded the defendants' litigation expenses. Here, Fattah claims that he was deprived of general, fungible income. Thus, whether the Government in fact "imped[ed] the supply of defense resources," *Stein*, 541 F.3d at 156, turns on both Fattah's income and his expenses. The evidence adduced at trial revealed that, despite his substantial income through DVHS, Fattah had financial difficulties. He incurred lavish personal expenses, owed exorbitant gambling debts, and owed thousands of dollars in unpaid taxes. He used lines of credit to cover his personal expenses and would take out one line of credit to cover the last. Thus for Fattah to have been able to afford the expensive counsel to which he claims to be entitled, the District Court on remand would be required to speculate that Fattah would have either made alterations to his lifestyle or would have been able to continually circulate lines of credit. Fattah has made no preliminary showing in support of any such

17

finding. Certainly if Fattah had continued his practice of lying in order to obtain new lines of credit, access to those funds would not have been protected by the Sixth Amendment. *See Luis*, 136 S. Ct. at 1088 (holding that the Sixth Amendment protects against "the pretrial restraint of legitimate, untainted assets").

We are far from the facts of *Stein*, where the Government directly interfered with an employer's unconditional payment of legal expenses. Even if we were prepared to entertain the notion that incidentally reducing a defendant's pre-indictment income might violate the Sixth Amendment—itself a dubious proposition—the attenuated causal chain alleged in this case must be supported by a "sufficiently specific, non-conjectural, and detailed" preliminary showing of a material dispute of fact. *Hines*, 628 F.3d at 105. Far from meeting that standard, Fattah's undisputed statements and actions directly contradict the facts proffered in support of his Sixth Amendment claim. His efforts to resolve the contradiction rely entirely on "[]conjectur[e]." *Id.* Accordingly, we decline to remand for an evidentiary hearing or otherwise grant relief on Fattah's Sixth Amendment claim.

## C

Second, Fattah argues that the FBI agent's conduct violated his right to due process guaranteed by the Fifth Amendment. Although the agent's conduct was unquestionably wrongful, it does not meet the high bar of

18

outrageous misconduct that would entitle Fattah to relief under the Fifth Amendment.

1

The Fifth Amendment to the Constitution of the United States provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has emphasized that the "touchstone of due process" is protection against arbitrary government action. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (citation omitted). Government action is "arbitrary in the constitutional sense" when it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 846, 847 n.8 (citation omitted). "While the measure of what is conscience shocking is no calibrated yard stick, it does, as Judge Friendly put it, 'poin[t] the way.'" *Id.* at 848 (alteration in original) (citation omitted).

The conduct of a law-enforcement officer may violate the Fifth Amendment if it is "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell,* 411 U.S. 423, 431–32 (1973). For example, in *Rochin v. California* the Supreme Court held that an officer violated the Fifth Amendment when, in order to preserve evidence that the suspect had swallowed, he ordered a doctor to pump the suspect's stomach—a practice the Supreme Court considered "brutal" and "offensive." 342 U.S. 165, 174

19

(1952). But "the judiciary is extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." *Voigt*, 89 F.3d at 1065. "We must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable; the ramifications are wider and more permanent than when only a statutory defense is implicated." *United States v. Jannotti*, 673 F.2d 578, 607 (3d Cir. 1982) (en banc).

This Court has considered, but rejected, Fifth Amendment challenges to law enforcement conduct in a variety of contexts, such as where the Government allegedly used an undercover agent's sexual relationship with a suspect to obtain inculpatory information, *see United States v. Nolan-Cooper*, 155 F.3d 221, 232 (3d Cir. 1998), and where the Government allegedly interfered with the defendant's attorney-client privilege, *see United States v. Hoffecker*, 530 F.3d 137, 156 (3d Cir. 2008); *Voigt*, 89 F.3d at 1066. Claims of outrageous government misconduct are commonly asserted where an undercover officer allegedly aided or participated in the criminal activity charged against the defendant. *See, e.g.*, *Hampton v. United States,* 425 U.S. 484 (1976) (plurality opinion); *Russell,* 411 U.S. 423.

This Court has granted relief on a claim of outrageous government misconduct only once. In *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), this Court held that the Government violated the Due Process Clause when an agent was "completely in charge and

20

furnished all of the [relevant] expertise" to create a methamphetamine laboratory. *Id.* at 380–81. In short, the Government "created the crime for the sole purpose of obtaining a conviction." *United States v. Dennis*, 826 F.3d 683, 695 (3d Cir. 2016) (citation omitted). Since *Twigg* was decided, this Court has repeatedly distinguished,[7] and even questioned, its holding. *See, e.g.*, *United States v. Beverly*, 723 F.2d 11, 12 (3d Cir. 1983).

2

This is not a case like *Twigg*, where the Government's conduct was intertwined with the defendant's. Instead, Fattah and amicus counsel argue that, because the FBI agent violated (or may have violated) certain laws, his conduct is so outrageous that it bars conviction. *See Russell*, 411 U.S. at 430. We conclude, however, that the agent's conduct "is distinctly not of that breed." *Id.* at 432.

First, Fattah and amicus counsel argue that a Fifth Amendment violation was predicated on a separate

---

[7] *See*, e.g., *United States v. Lakhani*, 480 F.3d 171, 182 (3d Cir. 2007); *United States v. Pitt*, 193 F.3d 751, 761 (3d Cir. 1999); *United States v. Driscoll*, 852 F.2d 84, 86 (3d Cir. 1988); *United States v. Martino*, 825 F.2d 754, 762–63 (3d Cir. 1987); *United States v. Ward*, 793 F.2d 551, 555 (3d Cir. 1986); *Jannotti*, 673 F.2d at 608–09.

violation of the Sixth Amendment. But as we have already held, Fattah failed to establish a Sixth Amendment violation.

Second, amicus counsel argues that the agent violated Rule 6(e) of the Federal Rules of Criminal Procedure by disclosing Fattah's identity as the target of a grand jury investigation. But the District Court found that Fattah failed to make a preliminary showing of such a violation, and Fattah does not challenge that finding on appeal.[8]

Third, amicus counsel argues that the officer may have committed obstruction of justice in violation of 18 U.S.C. § 1503(a). But Fattah and amicus counsel fail to show an "evil intent to obstruct" the due administration of justice. *United States v. Aguilar*, 515 U.S. 593, 599 (1995). *See generally United States v. Sussman*, 709 F.3d 155, 168 (3d Cir. 2013). On the limited record before us, we cannot prejudge the commission of this alleged

---

[8] Even if that finding were challenged on appeal, we note a defendant must show prejudice to win dismissal of the indictment for a breach of grand jury secrecy; showing a simple violation of Rule 6(e) is insufficient. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988). But if defendants could simply reframe a violation of Rule 6(e) as a violation of the Fifth Amendment, they could evade *Nova Scotia*'s prejudice requirement entirely.

offense.[9] Such a determination is better left to the prosecutorial process following a full investigation.

Fourth, amicus counsel argues that the agent may have violated FBI policy. But the violation of internal policy alone does not amount to a violation of constitutional due process. *See United States v. Christie*, 624 F.3d 558, 573 (3d Cir. 2010) (rejecting a claim of outrageous misconduct where the Government allegedly violated guidelines that "do not themselves create rights for criminal defendants").

Finally, we are left with the arguments that the FBI agent disclosed certain confidential information contained in Fattah's tax returns in violation of 26 U.S.C. § 6103.[10] According to Fattah's opening brief, the

---

[9] Amicus counsel relies on out-of-circuit dicta. *See N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 163 (2d Cir. 2006). Regardless, it is not settled that such a violation would entitle Fattah to relief. *See United States v. Payner*, 447 U.S. 727, 737 n.9 (1980) ("[T]he limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the *defendant*." (quoting *Hampton*, 425 U.S. at 490)).

[10] Amicus counsel adds that the agent may have committed a misdemeanor under 18 U.S.C. § 1905, and also declares that the agent lied to the Magistrate Judge about the importance of confidentiality when he sought an order placing the search warrants under seal. These

Government conceded that violation in a parallel civil matter. But we are unable to conclude that the disclosure of this financial information, standing alone or in combination with any of the above considerations, is "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Russell*, 411 U.S. at 431–32. "[T]he remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police" if such a violation occurred. *Hampton*, 425 U.S. at 490; *see Jannotti*, 673 F.2d at 609; *United States v. Walters*, 16-cr-338, slip op. at 18–19 (S.D.N.Y. Mar. 1, 2017).

Accordingly, we conclude that the FBI agent's conduct did not violate Fattah's Fifth or Sixth Amendment rights. That said, our opinion in this case should by no means "be construed as an approval of the government's conduct." *Beverly*, 723 F.2d at 13. To ensure the public trust, the Government bears a serious responsibility to investigate any malfeasance and take appropriate action. We hope that the FBI and prosecutorial authorities have done just that.

## III

We now turn to Fattah's four remaining arguments that (A) various counts of the indictment fail to state an offense, (B) the Government constructively amended the

---

additional considerations do not alter our constitutional analysis.

indictment at trial, (C) the Superseding Indictment improperly joins unrelated charges, and (D) the Government's search warrants were impermissibly broad. We reject each argument.

A

First, Fattah argues that various counts in the indictment fail to state an offense. *See* Fed. R. Crim. P. 7(c)(1). Reviewing de novo, we reject Fattah's argument.

"[A]n indictment is facially sufficient if it (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Stevenson*, 832 F.3d 412, 423 (3d Cir. 2016) (quoting *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012)). We address the Counts in the same order as Fattah's brief.

1. *Count 12 (Bank Fraud in violation of 18 U.S.C. § 1344)*. Count 12 charged Fattah with misrepresenting to United Bank that he would use a line of credit for business expenses when he meant to use the money for personal expenses. Fattah argues that Count 12 merely charged breach of contract, not a criminal offense. According to Fattah, the conduct charged in the Superseding Indictment is consistent with making truthful representations at the time he applied for the loan but later failing to use the funds as promised.

25

But Count 12 properly charged that Fattah employed "false and fraudulent pretenses, representations or promises" in order "to obtain" a loan. Supp. App. 18; 18 U.S.C. § 1344. In other words, the Superseding Indictment plainly charged Fattah with making representations that he knew to be false or fraudulent at the time he made them. It then supported that allegation with specific facts about Fattah's representations, his subsequent conduct, and the timing in between.

Fattah relies on several inapposite cases that address a defendant's failure to disclose information to a bank. For example, in *United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012), the Eighth Circuit held that a charge of bank fraud alleged mere breach of contract where, after obtaining approval for a loan, the defendant sold collateral without notifying the bank as required by the loan agreement. The Eighth Circuit concluded that the indictment failed to state an offense, in part, because the "breach of the security agreement was not accompanied or preceded by express misrepresentations." *Id.*

Here, by contrast, the Superseding Indictment properly charged that Fattah made express misrepresentations "to obtain" the loan. Supp. App. 18. Whether Fattah's statements were knowing misrepresentations (as opposed to sincere, unfulfilled promises) was a question of fact for the jury. The jury,

26

properly instructed, found beyond a reasonable doubt that Fattah made knowing misrepresentations.[11]

---

[11] Fattah argues that the Government failed to prove intent to defraud beyond a reasonable doubt. Reviewing the evidence in a light most favorable to the prosecution, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), we reject this argument because the Government introduced ample circumstantial evidence of intent. For example, within two days of receiving approval for the loan, Fattah withdrew substantial funds from United Bank, deposited the funds in his personal checking account, and then began using the funds for personal expenses such as paying down gambling debts. The close timing of events, combined with Fattah moving the funds in an apparent effort to prevent United Bank from learning the funds' true uses, permit an inference that Fattah never intended to use the loan as promised. That conclusion is further supported by Fattah's own statements, which demonstrate a cavalier disregard for the funds' appropriate uses. *See, e.g.*, Supp. App. 82 ("F*** the credit lines; it's not about credit lines it's about figuring out how to make money and having fun . . . ."); Supp. App. 188 (United Bank lending officer testifying that Fattah stated "something to the effect of that it's his business, his company that he's entitled to utilize the funds as he determined"). Thus, based on the evidence presented, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

2. *Counts 20–23 (Wire Fraud in violation of 18 U.S.C. § 1343)*. The wire fraud Counts charge Fattah with requesting excess funds for DVHS's budgets and pocketing the surplus. Fattah repeats his breach-of-contract argument that the Superseding Indictment merely charged that he failed to perform all of the services identified in the budgets, not that he lied to obtain those funds. We reject this argument for the reasons provided above.[12]

3. *Count 19 (Theft from a Program Receiving Federal Funds in violation of 18 U.S.C. § 666(a)(1)(A))*. This Count alleged that Fattah's scheme to manipulate DVHS's budgets defrauded the PSD, an organization that received more than $10,000 in federal assistance. Supp. App. 29. Fattah relies on *United States v. Copeland*, 143 F.3d 1439, 1441 (11th Cir. 1998), and other similar cases for the proposition that a company does not receive "Federal assistance," 18 U.S.C. § 666(b), if it is "engaged in purely commercial transactions with the federal

---

[12] On Counts 20–23, Fattah's argument based on sufficiency of the evidence likewise fails. The Government introduced sufficient circumstantial evidence from which a reasonable jury could conclude that Fattah knew the budgets were false at the time he submitted them. The evidence included Fattah's own tape-recorded statements, records from his computers, wire transactions from DVHS to 259 Strategies, and statements from DVHS employees questioning the veracity of the budgets.

28

government," *Copeland*, 143 F.3d at 1441. On that basis, Fattah argues that DVHS's contractual relationship with the PSD was "purely commercial" and therefore outside the scope of § 666. But DVHS's contract with the PSD is irrelevant. The applicability of § 666 turns on the PSD's relationship with the federal government, not on its relationship with DVHS. Fattah does not dispute that the PSD received sufficient federal assistance to place it within the ambit of § 666(b). Therefore, defrauding the PSD amounted to a violation of § 666(a)(1)(A).

4. *Counts 1–7 (False Statements to Obtain Bank Loans in violation of 18 U.S.C. § 1014).* Counts 1–4 charge Fattah with making false statements to four different banks in order to obtain loans. Fattah reiterates his breach-of-contract argument, which we reject for the reasons provided above. Counts 5–7 charge that Fattah aided and abetted false statements by his friend, Matthew Amato. According to Fattah, the indictment charges him with merely knowing Amato would lie to the bank, which is not a crime. But the Counts properly alleged that Fattah "knowingly induced and procured" Amato to commit the offenses. Supp. App. 9–11.

Fattah also raises an argument specific to Count 1. Count 1 alleges that Fattah used a false tax return to misrepresent financial information about 259 Strategies to a bank. Fattah argues that this is improper because the Government did not separately charge him with filing a false tax return for that year; such a charge would be time-barred. But a false tax return plainly constitutes a

"false statement or report." 18 U.S.C. § 1014; *see United States v. Nash*, 115 F.3d 1431, 1439 (9th Cir. 1997) ("[T]he 1985 and 1986 false tax returns were separate documents that could independently support separate counts under section 1014."). The fact that the statute of limitations lapsed on a separate tax offense does not, as Fattah argues, render the return "true and correct," Fattah Br. 33, for purposes of the charged offense. *Cf. United States v. Forsythe*, 560 F.2d 1127, 1135 (3d Cir. 1977) (holding that the federal statute of limitations governs RICO charges even if the predicate offenses were time-barred); *United States v. Guerrero*, 882 F. Supp. 2d 463, 495 (S.D.N.Y. 2011) (holding that charges for drug-related murders "are not subject to a statute of limitations, regardless of whether the underlying narcotics conspiracy, if charged separately, would be time-barred" (citation omitted)), *aff'd*, 560 F. App'x 110 (2d Cir. 2014).

5. *Count 8 (False Statements Concerning a Loan Insured by the Small Business Administration in violation of 18 U.S.C. § 1001)*. The indictment charged that Fattah told a bank that he had an "inability to earn substantial income." Supp. App. 12. Though Fattah calls this a "statement of opinion," Fattah Br. 34, whether that statement was a knowing misrepresentation was likewise a question of fact for the jury. Nor was that statement the only misrepresentation charged; the indictment also charged Fattah with misrepresenting the dollar figure of his income and the operational status of 259 Strategies.

30

Fattah also argues that his statement was protected by the First Amendment, but it is well established that "the First Amendment does not shield fraud." *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003).

6. *Count 11 (False Statements to Settle a Bank Loan in violation of 18 U.S.C. § 1014)*. Count 11 charges Fattah with lying in a civil deposition in an effort to evade repaying one of his creditors. Fattah argues that the statute does not cover lying in depositions because, otherwise, "no individual would ever sit for a civil deposition in state court without invoking their rights to remain silent." Fattah Br. 34.

A false statement taken in a deposition is no less a "false statement or report." 18 U.S.C. § 1014; *see United States v. Todosijevic*, 161 F.3d 479, 483 (7th Cir. 1998). Nor is it particularly unusual that a statement made in civil litigation could have criminal consequences. That is precisely why litigants in civil matters are permitted to invoke their Fifth Amendment rights. *See, e.g.*, *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977) ("[S]ince the test is whether the testimony might later subject the witness to criminal prosecution, the privilege is available to a witness in a civil proceeding . . . .").

7. *Count 13 (False Statements to Obtain a Bank Loan in violation of 18 U.S.C. § 1014)*. This Count charges Fattah with failing to disclose to a bank, *inter alia*, his other sources of indebtedness. Fattah argues that the loan application did not ask for that information. But

31

the loan application *did* ask for that information, which Fattah omitted. Supp. App. 434. Fattah insists that he was not obligated to disclose that information because his only outstanding loans were in his sham business's name, not his own. Even accepting that distinction *arguendo*, that argument goes to the sufficiency of the evidence, not a failure to state an offense. As the Count offers an alternative theory of conviction (lies about monthly rent and car payments), we will "assume that the jury convicted on the factually sufficient theory." *United States v. Syme*, 276 F.3d 131, 144 (3d Cir. 2002).

Accordingly, we conclude that the Superseding Indictment stated offenses on all Counts.

B

Fattah next argues that the Government constructively amended the Superseding Indictment by introducing certain evidence or making certain arguments that "do not appear in the indictment." Fattah Br. 35. We conclude that the Superseding Indictment was not constructively amended.

An indictment is constructively amended when "the evidence and jury instructions at trial modify essential terms of the charged offense" such that "there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense . . . actually charged." *United States v. Repak*, 852 F.3d 230, 257–58 (3d Cir. 2017) (quoting *United States v. Daraio*, 445 F.3d 253, 259–60 (3d Cir. 2006)). "If a

defendant is convicted of the same offense that was charged in the indictment, there is no constructive amendment." *United States v. Vosburgh*, 602 F.3d 512, 532 (3d Cir. 2010).

First, Fattah identifies certain factual allegations that were not specifically enumerated in the Superseding Indictment. For example, the prosecutor said in his opening statement that Fattah "told Sun Bank that 259 Strategies had one employee. He told Bank of America they had three employees." Fattah Br. 35. While the Superseding Indictment does not specifically allege that Fattah misrepresented the number of employees at 259 Strategies, at most this constitutes a "variance" from the facts alleged. *Vosburgh*, 602 F.3d at 532. Such a variance constitutes reversible error "only if it is likely to have surprised or has otherwise prejudiced the defense." *Id.* (quoting *Daraio*, 445 F.3d at 262). Here, there is no risk of surprise because the indictment identified a non-exhaustive list of statements on a single loan application—statements that would be well known to their author, Fattah.

Second, Fattah identifies arguments and evidence that he claims to be irrelevant or prejudicial. For example, Fattah complains that the Government introduced evidence "intended to inflame the jury" by, *inter alia*, highlighting his $15,000 bill at the Capital Grille restaurant (Br. 36, 40), highlighting his gambling losses of $125,280 (Br. 37), referring to Fattah as a "son of privilege" and as "Congressman Fattah's son" (Br.

33

38), referencing Fattah's condominium at the Ritz Carlton (Br. 40, 43), and calling Fattah an "unqualified [college] dropout" (Br. 41). Fattah also argued that the Government adduced evidence irrelevant to the crime charged. For example, he asserts that any evidence about how he used the lines of credit is irrelevant because the crime was completed at the time Fattah made the misrepresentation (Br. 35–36, 38, 44). But these objections to relevance and prejudice are quintessentially evidentiary arguments governed by Rules 401, 402, and 403 of the Federal Rules of Evidence. The time to object to and appeal the admissibility of that evidence has passed. Far from constructively amending the Superseding Indictment, the evidence at issue (and the Government's fair commentary on that evidence) provide circumstantial illustration of Fattah's motive, opportunity, intent, and knowledge regarding the crimes charged.

And third, Fattah argues that the Government amended the Superseding Indictment by introducing evidence of uncharged crimes. For example, the Government introduced evidence that Fattah stole money from clients of his sham concierge service, American Royalty. That theft was not charged in the Superseding Indictment; instead, the evidence was offered to show the existence of income that Fattah failed to report on his tax return and to his creditors. *See* Fed. R. Evid. 404(b). Again, this did not change the theory of the prosecution or modify essential terms of a charged offense. As we have held, introducing evidence of other crimes does not

34

constructively amend the indictment when the jury is properly instructed. *See Daraio*, 445 F.3d at 260 ("Although we agree with Daraio that the government presented a significant amount of evidence concerning her prior tax non-compliance beyond that charged in the indictment, the district court's instructions ensured that the jury would convict her, if at all, for a crime based on conduct charged in the indictment.").

Accordingly, we conclude that the Superseding Indictment was not constructively amended.

C

Next, Fattah argues that the indictment improperly joins three distinct categories of crime: bank fraud, tax fraud, and fraud on the Philadelphia School District. We reject this argument as well.

Under Rule 8(a) of the Federal Rules of Criminal Procedure, an indictment may include multiple counts that "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). "If the reviewing court determines that counts have been improperly joined, it must then apply a harmless error analysis, reversing the trial court if the misjoinder resulted in actual prejudice to the defendant." *United States v. McGill*, 964 F.2d 222, 241 (3d Cir. 1992).

Reviewing de novo, we conclude that the charges were properly joined for three reasons. First, the offenses were of a "similar character." Fed. R. Crim. P. 8(a). Each involved a series of false representations about business entities owned or represented by Fattah. Those misrepresentations were calculated to either steal or avoid paying certain funds. Second, the charged offenses were interrelated "parts of a common scheme or plan." *Id.* For example, Fattah would use false tax information to convince banks to offer him loans. Similarly, both the fraud on the PSD and the bank fraud had the effect of transferring ill-gotten gains to 259 Strategies, which Fattah used as his personal bank account. Thus, the different offenses represent different components of a single "enrichment scheme," and "[j]oinder under this rationale is acceptable." *McGill*, 964 F.2d at 241. And third, this circuit does not have a per se prohibition on joining tax and non-tax charges. *See id.* ("Joinder of tax and non-tax claims is not unusual.").

Nor was Fattah prejudiced. Fattah has not explained how the joinder of these counts impaired the fairness of his trial, nor has he argued that the jury would be unable to "compartmentalize the evidence." *United States v. Walker*, 657 F.3d 160, 170 (3d Cir. 2011) (citation omitted). The District Court instructed the jury that "[e]ach count and the evidence pertaining to it must be considered separately," Supp. App. 254, and "juries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

We therefore conclude that the joinder of counts was not improper.

## D

Finally, Fattah argues that the search warrants executed at his home and office were overly broad. Specifically, he asserts that the search warrants were not particularized because they permitted the Government to seize business records spanning time periods not covered by the indictment. Reviewing de novo, we reject this argument.

Under the Fourth Amendment, "a warrant may not be issued unless . . . the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011). But the particularity requirement "must be applied with a practical margin of flexibility." *United States v. Sawyer*, 799 F.2d 1494, 1508 (11th Cir. 1986). "This flexibility is especially appropriate in cases involving complex schemes spanning many years that can be uncovered only by exacting scrutiny of intricate financial records." *United States v. Christine*, 687 F.2d 749, 760 (3d Cir. 1982).

In this case, the warrant authorized the seizure of a number of document types, including "[a]ll financial records," [a]ll checks paid to employees for wages," "[a]ll tax records," and other similar documents. Supp. App. 74–75. That level of particularity is consistent with what we approved in *Christine*: "all folders . . . all checks . . . all general ledgers (and) all correspondence . . . ."

37

687 F.2d at 753 (alterations in original). "By directing the searching officers to seize all of these items, the magistrate, rather than the officer, determined what was to be seized." *Id.*

Thus, based on the complex nature of the crime charged and appropriate direction provided by the Magistrate Judge, we conclude that the warrants satisfied the particularity requirement.

## IV

For the foregoing reasons, we will affirm the judgment of the District Court.