PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 19-1480

———

UNITED STATES OF AMERICA

v.

TREMAYNE JAMES,
Appellant

———

On Appeal from United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-18-cr-00144-001)
District Judge:  Honorable Sylvia H. Rambo

———

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
October 2, 2019

Before:  SHWARTZ, FUENTES and FISHER, *Circuit
Judges*.


(Filed: March 9, 2020)

Heidi R. Freese, Federal Public Defender
Quin M. Sorenson
Office of Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
        *Counsel for Appellant*


David J. Freed, United States Attorney
Scott R. Ford
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108
        *Counsel for Appellee*

———


OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Under the Federal Sentencing Guidelines, the sentences imposed for certain prior offenses, and for "offenses similar to them," may not be counted in the calculation of an individual's criminal-history score. U.S.S.G. § 4A1.2(c). One such offense is "[l]oitering." U.S.S.G. § 4A1.2(c)(2). Yet there is (and has long been) a great variety of loitering provisions in force across the United States, and it is unclear which of those laws impose a sentence excludable under the Guidelines. In *United States v. Hines*, 628 F.3d 101 (3d Cir. 2010), our Court went some way toward resolving this difficulty. "Loitering" in § 4A1.2(c)(2), we said, covers a class of offenses that we called "loitering *simpliciter*," and it does not reach a separate class that we dubbed "loitering plus." 628 F.3d at 108. We then held that the defendant's sentence under the New Jersey law at issue— which bars "wander[ing], remain[ing] or prowl[ing] in a public place with the purpose of unlawfully obtaining or distributing a controlled dangerous substance," N.J. Stat. Ann. § 2C:33-2.1(b)(1) (2019)—was countable because the offense is a form of loitering plus and, as applied to the defendant, was not sufficiently "similar to" the offenses that constitute loitering *simpliciter*.

The present appeal asks us to decide this same question for a sentence under Pennsylvania's anti-loitering statute, 18 Pa. Cons. Stat. § 5506 (2019). Because that law is different from the New Jersey provision in important respects, we take this opportunity to clarify our understanding of "[l]oitering" in § 4A1.2(c)(2).[1] We conclude that loitering *simpliciter* under

---

[1] A panel of this Court has already confronted, in a not-precedential opinion, the excludability of a sentence under §

the Guidelines encompasses all those offenses that do not require, either explicitly or by judicial interpretation, a purpose to engage in some type of unlawful conduct. On this understanding, we hold that the Pennsylvania law neither is a form of loitering *simpliciter* nor, as applied here, is sufficiently "similar to" the offenses that constitute that category. We accordingly will affirm the judgment of the District Court.

I

Early one morning in December 2017, Tremayne James's ten-year-old nephew found a loaded handgun in a kitchen drawer at his home. As he was examining it, the gun fired mistakenly. The bullet travelled through a wall and wounded the boy's sister, James's six-year-old niece, as she lay in bed. She made a full recovery, but police arrested James for a violation of 18 U.S.C. § 922(g)(1), which bars possession of a firearm (that has travelled in interstate commerce) by those convicted of a crime punishable by more than one year of incarceration. James pleaded guilty in July 2018, and a sentencing hearing was scheduled for early the following year.

The Presentence Report recommended a term of imprisonment of between 84 and 105 months. It assigned James a criminal history score of 10, including two points for a 2011 state conviction for "loitering and prowling at night time." 18 Pa. Cons. Stat. § 5506 (2019). That offense is a third-degree misdemeanor, *id.*, which under Pennsylvania law is punishable by up to one year of incarceration, *id.* § 1104(3).[2]

---

5506. *See United States v. Carter*, 536 F. App'x 294 (3d Cir. 2013). Although we agree with *Carter*'s result, we expand upon its analysis.

[2] A subsequent drug offense in 2013 qualified James for the § 922(g)(1) bar.

Although James initially received only sixty days' probation, subsequent probation violations led to a sentence of imprisonment for up to nine months. The length of that sentence triggered the addition of the two points. *See* U.S.S.G. § 4A1.1(b) (providing that two points are to be added for each prior sentence carrying a maximum term of imprisonment of between sixty days and one year and one month).

At the sentencing hearing, James's attorney objected. The Guidelines, she pointed out, provide that a sentence for "[l]oitering" and for all offenses "similar to" it should be excluded from the computation of the criminal-history score. U.S.S.G. § 4A1.2(c)(2). The two points were significant. A criminal-history score of 8 would have placed James in category IV with a prescribed sentence of 70 to 87 months of imprisonment. U.S.S.G. Ch. 5, Pt. A. James's criminal-history score of 10, however, put him in category V, leading to the 84-to-105-month range ultimately recommended.

The District Court overruled the objection and sentenced James to 105 months in prison, the top of his Guidelines range. Given this sentence, the two points for the loitering offense amount to at least an additional one and a half years in prison. James timely appealed.

II[3]

In order to decide whether the Guidelines require the exclusion of James's sentence under § 5506, we must begin by determining the scope of "[l]oitering" in § 4A1.2(c)(2). *Hines* called this category "loitering *simpliciter*" and held that it does

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291. Our review of legal interpretations of the Guidelines is plenary. *United States v. Jones*, 740 F.3d 127, 132 (3d Cir. 2014).

not include offenses like that of New Jersey's anti-loitering statute, which "requires a specific intent—subjectively held and objectively manifested—in addition to the mere act of wandering, remaining, or prowling in a public place." 628 F.3d at 111; *see also id.* at 113 (describing loitering *simpliciter* as "ha[ving] no specific intent" element). Elsewhere, though, *Hines* suggested positive definitions of loitering *simpliciter*— that it "is little more than suspiciously remaining in a public place," *id.* at 111-12, and that "[a] person loiters, within the meaning of the Guidelines, merely by wandering, prowling, or remaining in a public place," *id.* at 109.

These statements should not be understood to describe loitering *simpliciter*'s ceiling—to exhaust all the possible offenses that make up that category. It is "a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute.'" *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (alteration omitted) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). This, as *Hines* said, demands that we give "[l]oitering" in § 4A1.2(c)(2) the meaning it possessed "when the [United States Sentencing] Commission drafted [and promulgated] the Guidelines" in 1987. 628 F.3d at 112. However, it is also a "cardinal principle of statutory construction . . . to save and not to destroy" a statute by "giv[ing] effect, if possible, to [its] every clause and word." *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (citations omitted). The Guidelines, therefore, must be construed as having incorporated, at the very least, the minimally constitutionally permissible form of a loitering offense, as that floor was understood at the time of their adoption. A review of the relevant history in turn leads to the conclusion that "[l]oitering" under the Guidelines encompasses more than offenses that simply criminalize

wandering, prowling, or remaining in a public place. It includes all those offenses, even those with a *mens rea* element, that do not require of their violator a purpose to engage in some form of unlawful conduct.

A

By the late 1980s, loitering and vagrancy laws in the United States had changed significantly from those in force only three decades earlier. A commonly noted feature of the earlier laws, as we suggested in *Hines*, was that they criminalized a person's condition or status alone, eschewing the traditional requirements of a *mens rea* and an *actus reus*. As one commentator put it, the offenses were "defined in terms of *being* rather than in terms of *acting*." Forrest W. Lacey, *Vagrancy and Other Crimes of Personal Condition*, 66 Harv. L. Rev. 1203, 1204 (1953); *see, e.g.*, *Edelman v. California*, 344 U.S. 357 (1953) (analyzing Cal. Penal Code § 647(5) (Chase 1947), which bluntly declared that "[e]very idle, or lewd, or dissolute person[] . . . [i]s a vagrant, and is punishable" by fine and imprisonment); *Soles v. City of Vidalia*, 90 S.E.2d 249, 251 (Ga. Ct. App. 1955) (confronting a Georgia city ordinance that made it "unlawful for any person to idle, loiter or loaf upon any of the streets, sidewalks, alleys, lanes, parks or squares of [the] City of Vidalia").

Laws such as these served predominantly to "permit wider police discretion in [the] arrest of persons suspected of having committed or of intending to commit a crime." Note, *Use of Vagrancy-Type Laws for Arrest and Detention of Suspicious Persons*, 59 Yale L.J. 1351, 1352 (1950). They provided police a default legal basis to make an arrest where evidence was otherwise lacking. *See* Caleb Foote, *Vagrancy-Type Law and Its Administration*, 104 U. Pa. L. Rev. 603, 614-15 (1956). As a result, they invited selective enforcement by

7

police officers, judges, and juries, with the burden commonly falling on disfavored racial and social groups. *See* Risa Goluboff, *Vagrant Nation: Police Power, Constitutional Change, and the Making of the 1960s*, at 15-20, 115-27 (2016).

That reality, however, also brought the early loitering and vagrancy laws under sustained legal attack. These challenges came to emphasize, in addition to other arguments, two principles of the Supreme Court's inchoate void-for-vagueness doctrine: that the laws either failed to provide ordinary persons adequate notice of the prohibited conduct[4] or permitted the arbitrary exercise of enforcement discretion.[5] *See id.* at 140-42, 247; Anthony G. Amsterdam, Note, *The Void-for-Vagueness Doctrine in the Supreme Court*, 109 U. Pa. L. Rev. 67, 76 (1960). Over time, this line of attack proved remarkably successful; by the late 1960s, increasing numbers of federal courts were invoking these principles to strike down vagrancy and loitering laws. *See* Goluboff, *supra*, at 253-57.

The movement culminated in *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972). There, the Supreme Court invalidated, on these same two grounds, a Florida city

---

[4] *See, e.g.*, *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.").

[5] *See, e.g.*, *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940); (observing that "a penal statute . . . which does not aim specifically at evils within the allowable area of State control" "readily lends itself to harsh and discriminatory enforcement by local prosecuting officials"); *Herndon v. Lowry*, 301 U.S. 242, 263-64 (1937) ("The statute, as construed and applied, amounts merely to a dragnet . . . . No reasonably ascertainable standard of guilt is prescribed.").

ordinance that criminalized those who "wander[] or stroll[] around from place to place without any lawful purpose or object." 405 U.S. at 156 n.1. Just over a decade later, the Court reaffirmed this doctrine, declaring unconstitutional a California statute that, as interpreted by the state appellate court, required all persons "[w]ho loiter[] or wander[] upon the streets or from place to place without apparent reason or business" to provide a "credible and reliable" identification of themselves when asked to do so by a police officer. *Kolender v. Lawson*, 461 U.S. 352, 353 n.1, 355-56 (1983). The trouble with the statute, the Court emphasized, was that it "vest[ed] virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute." *Id.* at 358.

B

It was in this context that the newly formed federal Sentencing Commission in the mid-1980s included "[l]oitering" among the offenses whose sentence should be excluded from a defendant's criminal-history calculation. The vagrancy-law revolution had created a complex doctrinal landscape. Although hardly uniform before *Papachristou*, loitering laws grew increasingly diverse after that decision as state and local jurisdictions enacted provisions of greater specificity, and as defendants challenged existing laws on constitutional grounds. For our purposes here, we can identify two general categories of these offenses. Only the latter, we conclude, constitutes "[l]oitering" under § 4A1.2(c)(2).

1

The first category comprises those laws that either explicitly require a purpose to engage in some type of unlawful conduct (such as prostitution or drug trafficking) or have been authoritatively interpreted to possess such a scienter

9

requirement. By 1987, it was well established that a *mens rea* element could at least mitigate vagueness concerns. *See, e.g.*, *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 & n.14 (1982); *Colautti v. Franklin*, 439 U.S. 379, 395 (1979). Most importantly, with regard to vagrancy and loitering laws, *Papachristou* suggested that the requirement of "a specific intent to commit an unlawful act" could address the concern over lack of notice. 405 U.S. at 163; *see also Screws v. United States*, 325 U.S. 91, 102 (1945) (plurality opinion). As a result, in the years after *Papachristou* and *Kolender*, courts overwhelmingly upheld against constitutional challenge laws that made it illegal to loiter for the purpose of engaging in unlawful conduct.[6] Some courts also interpreted loitering laws to possess such a *mens rea* requirement in order to avoid declaring them unconstitutional.[7]

2

The second category includes not only the sort of offenses invalidated in *Papachristou* and *Kolender*—which of course persisted until challenged[8]—but also offenses of greater

---

[6] *See, e.g.*, *Short v. City of Birmingham*, 393 So.2d 518, 522 (Ala. Crim. App. 1981); *State ex rel. Williams v. City Court of Tucson*, 520 P.2d 1166, 1170 (Ariz. Ct. App. 1974); *People v. Superior Court*, 758 P.2d 1046, 1055-56 (Cal. 1988) (en banc); *City of Seattle v. Slack*, 784 P.2d 494, 497 (Wash. 1989) (en banc); *City of Milwaukee v. Wilson*, 291 N.W.2d 452, 457 (Wis. 1980). *But see People v. Gibson*, 521 P.2d 774, 775 (Colo. 1974) (en banc).

[7] *See, e.g.*, *State v. Evans*, 326 S.E.2d 303, 307 (N.C. Ct. App. 1985); *City of Tacoma v. Luvene*, 827 P.2d 1374, 1383 (Wash. 1992) (en banc).

[8] Both shortly before and after *Papachristou*, courts commonly declared unconstitutional pure status offenses, such as those

specificity regarding the conduct they prohibited and the grounds for arrest, though nevertheless falling short of requiring a purpose to engage in unlawful conduct. In general, the laws of this latter group possessed two features. First, they described a circumstance-based offense, where conviction depended upon the existence of certain objective and often enumerated conditions. One especially common version, for example, penalized public loitering "in a manner [and/or] under circumstances manifesting the purpose" of engaging in a specified unlawful act, usually either prostitution or drug trafficking. *See, e.g.*, *Brown v. Municipality of Anchorage*, 584 P.2d 35, 36 (Alaska 1978); *City of Akron v. Rowland*, 618 N.E.2d 138, 143 (Ohio 1993). The law would then provide a conjunctive or (more often) disjunctive list of circumstances "which may be considered in determining whether" such a purpose is manifest. *See, e.g.*, *Coleman v. City of Richmond*, 364 S.E.2d 239, 242 (Va. Ct. App. 1988). Second, the laws also frequently possessed a "stop and identify" element, preventing arrest until after the suspect had the opportunity to explain his or her conduct—with varying standards for whether the explanation was acceptable—and barring conviction if the explanation was true and the conduct lawful. *See, e.g.*, *Wyche v. State*, 619 So.2d 231, 233 n.2 (Fla. 1993); *Lambert v. City of Atlanta*, 250 S.E.2d 456, 457 (Ga. 1978); *see also Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 183-84 (2004) (describing the relation of stop-and-identify statutes to traditional vagrancy and loitering laws).

---

that criminalized loitering in a specified place. *See, e.g.*, *People ex rel. C.M.*, 630 P.2d 593, 597 (Colo. 1981) (en banc); *Bullock v. City of Dallas*, 281 S.E.2d 613, 614 (Ga. 1981); *State v. Grahovac*, 480 P.2d 148, 151 (Haw. 1971); *State v. Stilley*, 416 So.2d 928, 929 (La. 1982).

State and federal courts divided on whether this sort of loitering offense was unconstitutional. Laws containing one or both of these features were occasionally upheld,[9] but were also often invalidated on various grounds.[10] An exception to this general pattern was the loitering provision of the Model Penal Code (MPC), which was adopted in several states and largely sustained against constitutional challenge.[11] It contains both of the features described above: objective circumstances "which may be considered in determining whether . . . alarm [for the safety of persons or property] is warranted"; and a requirement that a person be allowed "to identify himself and explain his

---

[9] *See, e.g.*, *Lambert*, 250 S.E.2d at 457 (rejecting due process and equal protection attacks but upholding the challenge on the basis of the Georgia Constitution's uniformity clause); *City of South Bend v. Bowman*, 434 N.E.2d 104, 107 (Ind. Ct. App. 1982); *People v. Smith*, 378 N.E.2d 1032, 1035 (N.Y. 1978); *In re D.*, 557 P.2d 687, 690 (Or. Ct. App. 1976).

[10] *See, e.g.*, *Johnson v. Carson*, 569 F. Supp. 974, 978 (M.D. Fla. 1983); *Brown*, 584 P.2d at 37; *Wyche*, 619 So.2d at 234; *Christian v. City of Kansas City*, 710 S.W.2d 11, 13 (Mo. Ct. App. 1986); *People v. Bright*, 520 N.E.2d 1355, 1360 (N.Y. 1988); *Rowland*, 618 N.E.2d at 145; *Profit v. City of Tulsa*, 617 P.2d 250, 251 (Okla. Crim. App. 1980); *Coleman*, 364 S.E.2d at 243-44; *City of Bellevue v. Miller*, 536 P.2d 603, 607 (Wash. 1975) (en banc).

[11] *See Watts v. State*, 463 So.2d 205, 207 (Fla. 1985); *Bell v. State*, 313 S.E.2d 678, 681 (Ga. 1984); *City of Milwaukee v. Nelson*, 439 N.W.2d 562, 568 (Wis. 1989). Notably, however, some courts declared city ordinances patterned after the MPC provision unconstitutional in the wake of *Kolender*. *See Fields v. City of Omaha*, 810 F.2d 830, 833-34 (8th Cir. 1987); *State v. Bitt*, 798 P.2d 43 (Idaho 1990).

presence and conduct" before an arrest can be made. Model Penal Code § 250.6 (Am. Law Inst. 2018).

"Loitering" in § 4A1.2(c)(2) of the Guidelines is best read to encompass this second category of loitering offenses—all those that do not require, either explicitly or by judicial interpretation, a purpose to engage in some type of unlawful conduct. An offense properly called loitering *simpliciter* may therefore still possess a *mens rea* element, provided that element does not amount to a requirement of a conscious object to commit an unlawful act. Because loitering in 1987 was a diverse offense, and the line between constitutionality and unconstitutionality varied across jurisdictions, loitering *simpliciter* is most aptly defined in this negative manner. In order to give effect to the statutory text, and to lend, as far as possible, "certainty and fairness" to courts' application of § 4A1.2(c)(2) in sentencing proceedings, *see Hines*, 628 F.3d at 109, this is the appropriate standard to mark the difference between loitering *simpliciter* and loitering plus.

### III

We now turn to whether the offense defined in § 5506 is "[l]oitering" under § 4A1.2(c)(2) of the Guidelines. The Pennsylvania statute provides: "Whoever at night time maliciously loiters or maliciously prowls around a dwelling house or any other place used wholly or in part for living or dwelling purposes, belonging to or occupied by another, is guilty of a misdemeanor of the third degree." 18 Pa. Cons. Stat. § 5506 (2019). James contends that the offense described here constitutes loitering *simpliciter* because it is essentially equivalent to that of the MPC provision. He emphasizes their *mens rea* elements in particular: that "maliciously" amounts at most to a general-intent requirement, on a par with the MPC's provision of loitering "in a manner not usual for law-abiding

13

individuals." Model Penal Code § 250.6. We cannot accept this argument for two reasons.

*First*, although the presence of the term "malice" in § 5506 might on an independent inquiry have led to a different conclusion, Pennsylvania courts have construed the statute to require an affirmative purpose to commit an unlawful act. James is correct that malice in its traditional sense encompasses more than such a mental state. A person could commit malicious mischief, for example, simply "out of a spirit of wanton cruelty." 4 William Blackstone, *Commentaries* *243. And in the homicide context, Pennsylvania courts have long said that the term "comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Drum*, 58 Pa. 9, 15 (1868); *see, e.g.*, *Commonwealth v. Green*, 347 A.2d 682, 686 (Pa. 1975); *Commonwealth v. Seibert*, 622 A.2d 361, 364 (Pa. Super. Ct. 1993); *see also* Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 857-59 (3d ed. 1982).

Yet Pennsylvania courts have interpreted "maliciously" in § 5506 to require a mental state higher than gross recklessness or even knowledge that one's conduct will cause a particular result. In *Commonwealth v. Duncan*, 321 A.2d 917 (Pa. 1974), the Pennsylvania Supreme Court upheld the statute against a post-*Papachristou* vagueness challenge by adopting an interpretation that read the term to require an "evil intent" and "a formed design of doing mischief to another or a wicked intention to do an injury to another." 321 A.2d at 920 (citing and quoting in part *Commonwealth v. McDermott*, 11 Pa. D. & C.2d 601, 604 (1958) (quoting 34 Am. Jur. 682, § 2)). Similarly, in *Commonwealth v. Dial*, 285 A.2d 125 (Pa. 1971), the Court approvingly cited a Superior Court interpretation that

14

defined maliciously "to mean '(having) as its purpose injury to the privacy, person or property of another.'" 285 A.2d at 128 (quoting *Commonwealth v. De Wan*, 124 A.2d 139, 141 (Pa. Super. Ct. 1956)). Subsequent Superior Court decisions have also adopted this interpretation. *See Commonwealth v. Sewell*, 702 A.2d 570, 571 (Pa. Super. Ct. 1997); *Commonwealth v. Melnyczenko*, 619 A.2d 719, 721-22 (Pa. Super. Ct. 1992); *Commonwealth v. Belz*, 441 A.2d 410, 411 (Pa. Super. Ct. 1982).

*Second*, § 5506 is a conspicuous exception to Pennsylvania's adoption of the Model Penal Code's other public-order provisions. Sections 5501-5510 of title 18 of the Pennsylvania Consolidated Statutes contain nine offenses currently in force; of these nine, only the language of the loitering offense in § 5506 does not substantially match that of its equivalent offense in the Model Penal Code.[12] *Compare, e.g.*, Model Penal Code § 250.7, *with* 18 Pa. Cons. Stat. § 5507 (2019). In fact, an early version of the bill that became the Pennsylvania General Assembly's Crimes Code Act of 1972 included the MPC's loitering provision, *see* S. 455, Gen. Assemb., 1971 Sess., Printer's No. 1379, at 157 (Pa. Nov. 29, 1971), but it was later replaced by the existing Pennsylvania law, *see* S. 455, Gen. Assemb., 1971 Sess., Printer's No. 1971,

―――――――――――

[12] One noteworthy difference between the texts is that where the MPC uses the *mens rea* term "purpose," the Pennsylvania statutes substitute the word "intent." *Compare* Model Penal Code § 250.1(1), *with* 18 Pa. Cons. Stat. § 5501 (2019). Under the MPC, when a material element of an offense involves "the nature of [a person's] conduct or a result thereof," the person "acts purposely with respect to [that] element" when "it is his conscious object to engage in conduct of that nature or to cause such a result." Model Penal Code § 2.02(2)(a)(i).

15

at 148-49 (Pa. June 29, 1972). Maintenance of § 5506's language, amid the substantial adoption of the MPC's other public-order offenses, suggests a meaningful difference between the provisions.

In sum, because Pennsylvania courts have construed § 5506 to contain a *mens rea* element more akin to the MPC's term "purposely," *see* Model Penal Code § 2.02(2)(a), than to any such element that might be read into § 250.6, and because ordinary textual analysis suggests that the provisions should be interpreted as materially different, we conclude that § 5506 is not "[l]oitering" under § 4A1.2(c)(2) of the Guidelines.

IV

Although § 5506 is distinct from loitering *simpliciter*, we must still decide whether it is sufficiently "similar to" that class of offenses to warrant exclusion of James's sentence from his criminal-history score. Under the Guidelines, a court should "never" count sentences for "offenses similar to" loitering *simpliciter*, "by whatever name they are known." U.S.S.G. § 4A1.2(c)(2). Some courts have highlighted this language, thinking it supports considering any offense dubbed "loitering" to be at least similar to the "[l]oitering" offense contemplated by the Guidelines. *See, e.g.*, *United States v. Lock*, 466 F.3d 594, 598-99, 602 (7th Cir. 2006). We disagree. To us, the proper focus of the inquiry should be not on the name of the offense, but rather on the features of which it is composed. We therefore give no weight to the fact that § 5506 is called "Loitering and prowling at night time."

Our Court employs the multifactor, "common sense" approach recommended in the commentary to § 4A1.2 for deciding whether an offense is "similar to" those listed. *Hines*, 628 F.3d at 110. There are five considerations:

(i) a comparison of punishments imposed for the

16

listed and unlisted offenses; (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.

U.S.S.G. § 4A1.2 cmt. 12(A). We will address each of these factors, albeit in a different sequence than that of *Hines*, ultimately concluding that James's sentence was properly counted in the calculation of his criminal-history score.

## A

The first factor calls for a comparison of the offenses' punishments. Section 5506 is a third-degree misdemeanor, which under Pennsylvania law is punishable by up to one year in prison. 18 Pa. Cons. Stat. §§ 106(b)(8), 1104(3) (2019). The government argues that this maximum possible sentence weighs in its favor because § 4A1.2(c)(1) provides that a sentence should be counted if it "was a term of probation of more than one year or a term of imprisonment of at least thirty days." U.S.S.G. § 4A1.2(c)(1). This point is inapposite. "Loitering" is listed under § 4A1.2(c)(2), not § 4A1.2(c)(1), and the linguistic identity of the beginning of these provisions—"Sentences for the following prior offenses and offenses similar to them, by whatever name they are known, are . . . ."—leads us to infer a meaningful variation in their subsequent language. Whereas § 4A1.2(c)(1) lists certain offenses and describes the type of sentences for those offenses that should be counted, § 4A1.2(c)(2) lists different offenses, the sentences for which should "never" be counted. If the Sentencing Commission, and by extension Congress, wanted to limit the excludable sentences of the § 4A1.2(c)(2) offenses

17

in the same way as it did for the § 4A1.2(c)(1) offenses, it would have done so. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration and citation omitted)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) (instructing that "a material variation in terms suggests a variation in meaning").

Our comparison of punishments, then, must look to the maximum sentences for the offenses that constitute loitering *simpliciter*. Notably, the MPC's loitering offense is classified as a "violation," Model Penal Code § 250.6, which is defined as "a noncriminal class of offenses . . . for which only a fine or other civil penalty is authorized," Model Penal Code § 1.04 explanatory note. Conviction of a violation does "not give rise to any disability or legal disadvantage based on conviction of a criminal offense." Model Penal Code § 1.04(5). Further, although both Arkansas and Florida classify their MPC-based loitering laws as misdemeanors, they punish violations of those laws by up to thirty and sixty days in prison, respectively. *See* Ark. Code Ann. §§ 5-4-401(b)(3), 5-71-213(e) (West 2019); Fla. Stat. §§ 775.082(4)(b), 856.021(3) (2019). The exception to this pattern is Georgia, whose MPC-based provision is punishable by imprisonment of up to a year. *See* Ga. Code Ann. §§ 16-1-3(5), (9); 16-11-36(c) (2019).[13] In general, then, the

---

[13] Other states with loitering provisions currently in force also tend to prescribe lighter maximum sentences. In New York, for example, loitering is punished as either a class B misdemeanor or a violation, depending upon the nature of the offense and whether it is a first offense. *See* N.Y. Penal Law §§ 240.35-.37

18

maximum punishment for a conviction under § 5506, a year in prison, would be at the highest end of the range of punishments allowable for offenses acknowledged to be forms of loitering *simpliciter*.

The third and fourth factors direct our attention to the elements of the compared offenses, and in particular to the level of culpability they require. The circumstantial elements of these offenses are largely similar: § 5506 requires loitering or prowling "at night time . . . around a dwelling house or any other place used wholly or in part for living or dwelling purposes, belonging to or occupied by another," while MPC § 250.6—which we take here to be paradigmatic—demands loitering or prowling "in a place, at a time, or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity." If anything, § 5506 is more specific than the MPC provision in its predicate circumstances, providing greater clarity of the interdicted behavior and constraining more fully police discretion.

Yet, despite this similarity, the scienter requirements distinguish § 5506 from loitering *simpliciter*. As noted, Pennsylvania state courts have interpreted the statute to prohibit an "intentional act, without legal justification or excuse, which has as its purpose injury to the privacy, person or property of another." *De Wan*, 124 A.2d at 141. Loitering traditionally required no mental element at all—it was effectively a status offense, criminalizing who a person was

_____

(McKinney 2019). Class B misdemeanors are punishable by up to three months in prison, and violations by up to fifteen days. N.Y. Penal Law § 70.15(1-a)(e)(2), (4). We take no position here on whether New York's loitering laws are either loitering *simpliciter* or loitering plus.

19

rather than what he or she had done. Although *Papachristou* and the revolution it represented did away with these old laws, a *mens rea* of specific intent or purpose was not thereby declared constitutionally necessary. The result has been the panoply of offenses we have called loitering *simpliciter*. Section 5506, however, includes just such a *mens rea* requirement.

B

The remaining factors encompass those more subjective measures of similarity—the punishment actually imposed and the degree to which the defendant's commission of the offense indicates a likelihood of recurring criminal conduct. *See* U.S.S.G. § 4A1.2 cmt. 12(A). These factors point in different directions. On the one hand, although James was initially sentenced to sixty days of probation, subsequent violations led him to be resentenced to a term of imprisonment of between three-and-a-half and nine months. In Pennsylvania, "[u]pon revocation [of probation,] the sentencing alternatives available to the court shall be the same as were available at the time of initial sentencing." 42 Pa. Cons. Stat. § 9771(b) (2019). The court "is free to impose any sentence permitted under the Sentencing Code" for the original crime. *Commonwealth v. Wallace*, 870 A.2d 838, 843 (Pa. 2005). As a result, James's subsequent sentence indicates "the perceived seriousness," U.S.S.G. § 4A1.2 cmt. 12(A), of his violation of § 5506 at least as well as his initial sentence. And by this measure, it reflects a prison term in excess of the maximum punishment called for not only by the MPC but also by most of the states that have adopted the MPC's loitering provision. On the other hand, however, the government concedes that the fifth factor—the indication of likely recidivism—counts in James's favor. We see no reason to question that concession.

## C

Although by some measures both § 5506 and its application to James are indeed similar to the offenses that comprise loitering *simpliciter*, we nevertheless conclude that the balance weighs against him. For one, § 5506's one-year maximum term of imprisonment is comparable only to the maximum punishment of a relative outlier in the range of punishments commonly available for violations of loitering provisions we acknowledge to constitute loitering *simpliciter*. Further, the sentence James received upon revocation of his probation also sits at the high end of that range. Finally, § 5506's *mens rea* requirement categorically distinguishes it from the "[l]oitering" offense listed in § 4A1.2(c)(2). Collectively, these considerations are sufficient to render the sentence imposed upon James for his violation of § 5506 countable under the Guidelines.

## V

For these reasons, we will affirm the judgment of the District Court.